### STATE OF CONNECTICUT *v.* MICHAEL WOODS
### (15169)

PETERS, C. J., and CALLAHAN, BORDEN, NORCOTT and PALMER, Js.

Argued April 20—decision released July 18, 1995

*Shelley R. Sadin,* for the appellant (defendant).

*Michele C. Lukban,* deputy assistant state's attorney, with whom, on the brief, were *Donald A. Browne,*

state's attorney, and *Cornelius P. Kelly*, assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Michael Woods, was convicted after a jury trial of the crime of escape in the first degree in violation of General Statutes (Rev. to 1991) § 53a-169 (a) (2).[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

The sole issue in this appeal is whether the trial court properly instructed the jury that the defendant, a convicted felon who had been transferred to a "community residence" to complete his sentence, could be found guilty of escape in the first degree solely for repeatedly failing to report to his supervising parole officer,

[1] General Statutes (Rev. to 1991) § 53a-169 provides in relevant part: "ESCAPE IN THE FIRST DEGREE: CLASS C FELONY. (a) A person is guilty of escape in the first degree . . . (2) if he escapes from any . . . community residence to which he was transferred pursuant to subsection (e) of section 18-100 . . . and he is in the custody of the commissioner of correction . . . ."

General Statutes (Rev. to 1991) § 18-100 provides in relevant part: "WORK-RELEASE AND EDUCATION-RELEASE PROGRAMS. . . .

"(e) If the commissioner of correction deems that the purposes of this section may thus be more effectively carried out, he may transfer any person from one correctional institution to another . . . or to an approved community residence with the concurrence of the warden, superintendent or person in charge of the facility to which said person is being transferred. Any inmate so transferred shall remain under the jurisdiction of said commissioner. Any inmate transferred to an approved community residence shall also be subject to specifically prescribed supervision by personnel of the department of correction until his definite or indeterminate sentence is completed."

Section 18-100 (e) was amended in 1993 to eliminate the supervised home release program. Under current law, transfers may be made only to a public or private nonprofit halfway house, group home or mental health facility. General Statutes § 18-100 (e), as amended by Public Acts 1990, No. 90-261, §§ 2, 19, effective July 1, 1993.

without also finding that he actually had absconded from his designated residence. We conclude that the trial court's instruction was improper.

The jury reasonably could have found the following facts. On February 4, 1992, pursuant to his authority under General Statutes § 18-100 (e), the commissioner of correction transferred the defendant from prison to a "community residence"[2] to complete a three year term of imprisonment for burglary in the third degree that had begun on December 4, 1991.[3] On the day of his transfer, the defendant met with his supervising parole officer, John Kelly, and reviewed and signed a standard written list of "Conditions of Community Residence."[4] Those conditions included reporting to his

[2] The defendant was initially transferred to the home of his brother at 775 Ryan Street, Bridgeport. On February 27, 1992, the defendant's supervising parole officer, John Kelly, approved the defendant's move from 775 Ryan Street to 117 Asylum Street, Bridgeport, where he was permitted to live on his own.

[3] The defendant was sentenced to five years incarceration, suspended after three years, with three years of probation. He was also sentenced to concurrent one year terms for violating General Statutes §§ 53a-173 (failure to appear) and 14-224 (b) (evading responsibility in operating a motor vehicle), and to a concurrent ninety day term for violating General Statutes § 14-215 (operating a motor vehicle without a valid license).

[4] That list provides: "I understand and agree to the following conditions:

"CONDITION # 1 - I agree that transfer to community release is at the discretion of the Community of Correction or designee.

"CONDITION # 2 - I agree that my transfer to community release is based upon the conclusion of the Commissioner of Correction that there is a reasonable probability that I will reside on community release without violating the law and that my transfer is not incompatible with the welfare of society. If for any reason, even for circumstances over which I have no control, this conclusion becomes no longer valid, then my transfer to community release will be revoked or modified accordingly.

"CONDITION # 3 - I agree that after transfer to community release, I am still an inmate and such transfer may be modified or revoked at any time at the discretion of the Commissioner of Correction or designee.

"CONDITION # 4 - I agree at any time I may be classified to any higher security level of confinement in a correction or designee.

"CONDITION # 5 - I agree the following conditions must be obeyed and even if I obey these conditions, I understand that I am not entitled to stay

supervising officer as directed. During their initial meeting on February 4, 1992, Kelly informed the defendant that he was under "intensive supervision" and would be required to report to Kelly's office at 40 Fairfield Avenue, Bridgeport, every Tuesday and Thursday. A further condition provided that the defendant would be guilty of escape in the first degree "if [he] escape[d] from a community residence to which [he had

on community release and can have no expectations of staying on community release.

"CONDITION # 6 - I realize that I am still an inmate and am responsible to conforming to the rules of the Department of Corrections.

"CONDITION # 7 - I will abide by all conditions of my release. Failure can result in reincarceration and disciplinary sanctions.

"CONDITION # 8 - I will report as directed and follow the instructions of my supervising officer.

"CONDITION # 9 - I agree that I am guilty of Escape in the First Degree, if I escape from a community residence to which I was transferred pursuant to subsection (e) of section 18-100.

"CONDITION # 10 - I will obey all laws and fulfill all my legal obligations.

"CONDITION # 11 - I will notify my supervising officer within 24 hours if at any time I am arrested for any offense.

"CONDITION # 12 - I will maintain such gainful employment or other activity as approved by my supervising officer.

"CONDITION # 13 - I agree that the supervising officer has the right to visit my residence or place of employment at any reasonable time.

"CONDITION # 14 - I will notify my supervising officer within 24 hours of any changes in my place of residence, employment or marital status.

"CONDITION # 15 - I will not at any time have firearms, ammunition, or any other weapon in my possession or under my control.

"CONDITION # 16 - I will not leave the State of Connecticut without prior permission from my supervising officer.

"CONDITION # 17 - I waive extradition to the State of Connecticut from any jurisdiction in or out of the United States.

"CONDITION # 18 - I will not at any time use, or have in my possession or control, any illegal drug or narcotic.

"CONDITION # 19 - I will receive permission from my supervising officer prior to operating any motor vehicle and if granted permission to drive, I will possess a valid operator's license and insurance.

"CONDITION # 20 - I will be responsible for all expenses, including medical expenses, if on supervised home release.

"CONDITION # 21 - I also agree to abide by the following conditions: Drug and alcohol treatment required."

been] transferred pursuant to subsection (e) of section 18-100."[5]

The defendant adhered to his reporting schedule for approximately two months. On April 9, 1992, however, he failed to report as scheduled. Thereafter he failed to report at all.

Kelly made several attempts to ascertain the defendant's whereabouts. He telephoned the defendant's brother on two occasions. During the second of these calls, Kelly asked the defendant's brother to tell the defendant to report on April 28. The defendant failed to do so. On May 8, Kelly sent a letter to the defendant at 117 Asylum Street. That letter subsequently was returned undelivered. On May 13, Kelly visited 117 Asylum Street and concluded from a visual inspection of the outside of the premises and a conversation with an unidentified neighbor that the defendant no longer resided there. On May 27, Kelly contacted the defendant's brother and concluded from his conversation with the brother that the defendant's whereabouts were unknown to his family at that time.

Kelly then had the defendant's case reviewed by a parole supervisor, who signed an application for an arrest warrant for the defendant on June 8, 1992. The defendant was served with the warrant and arrested on August 29, 1992. The defendant subsequently was convicted by a jury and sentenced by the court to a three year term of incarceration, to be served consecutively to his underlying sentence for burglary in the third degree.

---

[5] Although § 18-100 (d) confers upon the commissioner of correction the authority to promulgate rules of conduct for persons transferred under § 18-100 (e), criminal enforcement of such rules may not include "conduct that the statute itself . . . does not expressly proscribe. Such an enlargement of penal sanctions exceeds the authority of the commissioner." *State* v. *Lubus,* 216 Conn. 402, 411, 581 A.2d 1045 (1990).

The defendant's sole claim on appeal is that the trial court improperly instructed the jury that it could find him guilty of escape in the first degree based solely on his repeated failures to report to his supervising officer. We agree.

The court instructed the jury that "there are several elements which you must consider in arriving at a conclusion of whether or not the defendant is guilty of violating section 53a-169, subsection (a) (2). The first element is the escape. The second element is that at the time of the escape the defendant was a sentenced prisoner subject to the custody of the Commissioner of Correction, and third, *whether the defendant did escape by failing to report to his parole officer on more than one occasion*. The fourth element being whether the defendant elected community residence that had been approved by his parole officer." (Emphasis added.) The court repeated this instruction in substantially the same language twice in response to two inquiries from the jury asking for clarification of the definition of the word "escape."[6]

The defendant's principal disagreement with the court's instruction centers on what the court termed the third "element" of the crime of escape. In instructing the jury on how to answer the question of "whether the defendant did escape by failing to report to his parole officer on more than one occasion," the trial court correctly explained that "multiple failures to report to one's supervising parole officer are not, in and of themselves, an escape."

---

[6] The first inquiry from the jury asked that the court "[p]lease supply the judge's instruction—instructions as to the definition of the crime of escape," and that it "[p]lease supply the judge's instruction—instructions as to what was necessary for the—for a finding of guilty, and what was necessary for a finding of not guilty." The second jury inquiry asked the court to reread the instructions that it had given in response to the first set of questions.

The court, however, then instructed the jury as follows: "It is for you, the jury, to decide whether the multiple failures to report to his supervising authority in this supervised home release setting constitute absconding from supervision or escape. . . . In considering this, you should consider whether repeated failures to report as scheduled would reasonably support an inference of present or imminent custodial irregularity. The defendant . . . was required to report . . . twice per week on Tuesday and Thursday of each week. . . . *Now, both the third—that is the element, the failing—the repeated failures to report, and the fourth element, which is the unauthorized change of residence, do not have—both do not have to be proven to constitute escape. Either standing alone, if you find either exist in accordance with the instructions I give you—have given you, are sufficient to constitute escape.*[7] . . . [I]f you find . . . that the defendant did, in fact, fail to report to his parole officer on several occasions, you must then determine whether those failures to report constitute an escape or an absconding from supervision. If you find all those elements, then you should find the defendant guilty." (Emphasis added.) The defendant thereafter excepted to the jury charge, arguing that failures to report, by themselves, do not constitute an escape and that "absconding from *supervision*" is not a proper definition of escape. (Emphasis added.)

"To determine whether an error in the charge to the jury exists, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. *State* v. *Fleming*, 198 Conn. 255, 268–69, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); see *State* v. *Hines*, 187 Conn. 199, 206, 445 A.2d 314 (1982); *State*

---

[7] In response to jury inquiries, the court twice more instructed the jury that either a failure to report or an unauthorized change of address would alone be sufficient to constitute escape.

v. *Williams*, 182 Conn. 262, 268, 438 A.2d 80 (1980). In appeals not involving a constitutional question the court must determine whether it is reasonably probable that the jury [was] misled; *State* v. *Avis*, 209 Conn. 290, 305, 551 A.2d 26 (1988); *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1982); *State* v. *Williams*, supra [268]; but in appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. *State* v. *Corchado*, supra [660]; *State* v. *Williams*, supra [268]; see also *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967). A failure to provide adequate instructions on the elements of a crime, because of its potential for violation of the defendant's due process rights; *State* v. *Fleming*, supra, 269; *State* v. *Williams*, supra, 268–69; invokes the reasonably possible standard of review. In this case, because the alleged error relates to the elements of the crime charged, reversal of the defendant's conviction and a new trial are mandated if, in the context of the charge as a whole, it is reasonably possible that the jury was misled. *State* v. *Fleming*, supra, 269; *State* v. *Sinclair*, 197 Conn. 574, 581, 500 A.2d 539 (1985); *State* v. *Kurvin*, 186 Conn. 555, 558, 442 A.2d 1327 (1982)." (Internal quotation marks omitted.) *State* v. *Grullon*, 212 Conn. 195, 204–205, 562 A.2d 481 (1989). Under the facts and circumstances of this case, we conclude that a reasonable possibility exists that the jury was misled as to the conduct that constitutes an escape under § 53a-169 (a) (2).

"Interpretation of § 53a-169 (a) (2) must begin with the proposition that penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create. *State* v. *Roque*, 190 Conn. 143, 151, 460 A.2d 26 (1983); *Nowak* v. *Nowak*, 175 Conn. 112, 125, 394 A.2d 716 (1978); see also *State* v. *Mattioli*, 210 Conn. 573, 579,

556 A.2d 584 (1989); *State* v. *Champagne*, 206 Conn. 421, 430, 538 A.2d 193 (1988). . . . The rule that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise; General Statutes § 1-1 (a); *State* v. *Mattioli*, supra, 579; also guides our interpretive inquiry." (Internal quotation marks omitted.) *State* v. *Lubus*, 216 Conn. 402, 406–407, 581 A.2d 1045 (1990). Reliance upon the ordinary meaning of the term "escape," moreover, finds support in the 1969 debates surrounding the enactment of the state penal code, wherein the escape provisions were described as having "the customary definitions and penalty." 13 H.R. Proc., Pt. 11, 1969 Sess., p. 5046.

"In this case, neither the defendant nor the state argues that the word 'escape' in § 53a-169 (a) (2) is unclear or ambiguous, nor does the fact that opposing counsel contend for different meanings support such a characterization. See *Harris Data Communications, Inc.* v. *Heffernan*, 183 Conn. 194, 198, 438 A.2d 1178 (1981). Furthermore, the text of the statute nowhere indicates that the legislature intended to assign to the word anything other than its ordinary meaning. Accordingly, in the absence of other statutory guidance, we may appropriately look to the meaning of the word as commonly expressed in the law and in dictionaries. *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981)." *State* v. *Lubus*, supra, 216 Conn. 407.

This court previously has stated that "[t]he unifying overall theme of § 53a-169 is that an individual will risk punishment for 'escape' for an unauthorized departure from, or failure to return to, whatever may be designated as *his place of incarceration or confinement.*" (Emphasis added.) Id., 409. The nexus between escape and custody recognized in *Lubus* finds support in Black's Law Dictionary (5th Ed. 1979), which defines "escape" as "[t]he departure or deliverance out of cus-

tody of a person who was lawfully imprisoned before he is entitled to his liberty by the process of law."

Further support can be found in the New York penal code and the American Law Institute's Model Penal Code, upon which our legislature relied when it revised the state penal code in 1969. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11. Both contain "escape" provisions that have custodial overtones. The New York Court of Appeals, interpreting the escape provisions of the New York penal code, understood escape to mean " 'to get away (as by flight or conscious effort): break away, get free or get clear (the prisoner *escaped* from prison) . . . .' " (Citations omitted; emphasis in original.) *People* v. *Hutchinson,* 56 N.Y.2d 868, 870, 438 N.E.2d 1109, 453 N.Y.S.2d 394 (1982). Under the Model Penal Code, a person commits the crime of "escape" if he "unlawfully removes himself from official detention or fails to return to official detention following [a] temporary leave granted for a specific purpose . . . ." II A.L.I., Model Penal Code and Commentaries (1962) § 242.6.

In *State* v. *Lubus,* supra, 216 Conn. 409, after reciting the above definitions of "escape," we concluded that "[a] single failure to report [by an inmate released to an approved community residence under § 18-100 (e)] cannot . . . reasonably be construed as an unauthorized *departure* or failure to return." (Emphasis added.) We specifically did not decide in *Lubus* "whether, at some juncture, repeated failures to report as scheduled *would reasonably support an inference* of present or imminent custodial irregularity and thus evidence a violation of § 53a-169 (a) (2)." (Emphasis added.) Id. *Lubus* did not, however, hold that repeated failures to report could alone support an escape conviction without proof beyond a reasonable doubt of actual departure from the

defendant's designated *place* of confinement.[8] Our task, then, is to determine whether, strictly construed, the ordinary meaning of the criminal prohibition against "escapes from . . . [a] community residence" in § 53a-169 (a) (2) encompasses the repeated failures to report to a supervisor without a finding that the defendant absconded from his designated place of confinement, in this case, his approved residence.

The jury was charged that it could find the defendant guilty if it found only that he had repeatedly failed to report. Such an instruction improperly equates failure to report with an escape. While failure to report may be evidence that the defendant has left his designated place of confinement, it is not enough, standing alone, to prove an unauthorized physical departure from the designated place of confinement. Such a departure is necessary for there to be an "escape" within the meaning of § 53a-169 (a) (2).[9] Evidence that

[8] Subsequent to *Lubus*, the Appellate Court decided a case factually similar to the present case. In *State* v. *Jemison*, 35 Conn. App. 1, 2–5, 643 A.2d 1287 (1994), the defendant repeatedly failed to report to his supervising officer and there was substantial evidence of the fruitless attempts of the supervising officer to locate the defendant. The court instructed the jury that it could find the defendant guilty solely on the basis of his repeated failures to report to his supervising officer. Id., 5–6. The Appellate Court affirmed the conviction in *Jemison* on the ground that, under the facts of that case, "the defendant's repeated failures to report as scheduled . . . reasonably support an inference of present or imminent custodial irregularity and thus evidence a violation of § 53a-169 (a) (2)." (Internal quotation marks omitted.) Id., 8–9.

We agree with the defendant that to the extent that *Jemison* permits a conviction for escape to rest solely on a jury's finding that the defendant repeatedly did not report to his supervising officer as scheduled, it must be overruled. As we stated in *State* v. *Lubus*, supra, 216 Conn. 409, Connecticut's escape statutes encompass "unauthorized departure from, or failure to return to . . . [the inmate's] *place of incarceration or confinement.*" (Emphasis added.)

[9] For instance, one who is imprisoned who merely stays in his cell and refuses to report for roll call may not be criminally punished for escape because, although he has violated the rules of the department of correction, and may be subject to disciplinary measures in connection therewith, he has not breached the physical confines of his custody.

the supervising officer telephoned the defendant, sent letters and visited the designated residence might well support a finding of physical departure. Although we recognize that such evidence existed in this case, the reasonable possibility that the jury was misled to convict the defendant solely because of his failure to report requires a reversal of his conviction.

Viewing the charge as a whole, we are persuaded that it is reasonably possible that the jury was misled to believe that it could find the defendant guilty of escape in the first degree solely on the basis of his failure to report to his supervising officer as scheduled. We conclude, therefore, that the court's charge to the jury did not fulfill its mandate to "be accurate in law, adapted to the issues and adequate to guide the jury in reaching a correct verdict." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 182 Conn. 269; *Berniere* v. *Kripps*, 157 Conn. 356, 358, 254 A.2d 496 (1969).

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.