## STATE OF CONNECTICUT v. LINDA CALONICO
### (SC 16295)

McDonald, C. J., and Borden, Katz, Palmer and Sullivan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion officially was released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued October 31, 2000—officially released May 8, 2001

*Penn Rhodeen*, special public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom was *Michael J. Sullivan*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Linda Calonico, was convicted after a court trial of one count of larceny in the first degree in violation of General Statutes (Rev.

to 1995) § 53a-122 (a) (2).[1] She was sentenced to five

[1] General Statutes (Rev. to 1995) § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

General Statutes § 53a-119, which defines larceny, provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to:

"(1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody.

"(2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person.

"(3) Obtaining property by false promise. A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or does not believe that the third person intends to engage in such conduct. In any prosecution for larceny based upon a false promise, the defendant's intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed.

"(4) Acquiring property lost, mislaid or delivered by mistake. A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of larceny if, with purpose to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to it.

"(5) Extortion. A person obtains property by extortion when he compels or induces another person to deliver such property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: (A) Cause physical injury to some person in the future; or (B) cause damage to property; or (C) engage in other conduct constituting a crime; or (D) accuse some person of a crime or cause criminal charges to be instituted against him; or (E) expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or (F) cause a strike, boycott or other collective labor group action injurious to some person's business; except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of the group in whose interest the actor purports to act; or (G) testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or (H) use or abuse his position as a public servant by performing some

years imprisonment, suspended after one year, and five years probation. The trial court concluded that, based on the "totality of the evidence and the reasonable inferences to be drawn therefrom," the state had proven beyond a reasonable doubt that: (1) the victim, Mary Crook, had lacked the mental capacity to make reasonable decisions with respect to her assets and estate, or to make any gifts therefrom; (2) the defendant had had regular contact with the victim and knew or should have known of her mental incapacity; and (3) the "defendant with intent to deprive [the victim] of her property and to appropriate the same to herself or a third person, wrongfully [had taken] and obtained [the victim's] property," which was valued at approximately $800,000. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the defendant's appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant challenges the sufficiency of the evidence produced by the state. First, the defendant argues that we should abandon the waiver rule of *State* v. *Rutan*, 194 Conn. 438, 440–41, 479 A.2d 1209 (1984) (if defendant chooses to present evidence after motion for acquittal is denied immediately following state's evidence, defendant waives right to appellate review of trial court's ruling on motion). Second, the defendant argues that the state failed to prove that the victim had lacked the mental capacity to make gifts. The defendant also claims that the state failed to prove that she had the requisite, unlawful intent permanently to deprive the victim of the appropriated funds. Consequently, she argues that the state failed to prove the elements necessary to convict her of the crime of larceny in the first degree. We disagree with the defendant

act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; or (I) inflict any other harm which would not benefit the actor. . . ."

and conclude that, even without the defendant's evidence, the trial court reasonably could have concluded that the evidence offered by the state was sufficient to prove beyond a reasonable doubt that the defendant had committed larceny in the first degree by wrongfully taking the victim's assets without consent and with the intent permanently to deprive her of them in violation of § 53a-122 (a) (2). We, therefore, affirm the judgment of the trial court.

## I

As a preliminary matter, we address the defendant's claim that the trial court improperly denied her motion for judgment of acquittal at the end of the state's case-in-chief. The defendant argues that appellate review of a claim of evidentiary sufficiency should be limited to the evidence in the record at the close of the state's case. Therefore, she advocates that we abandon the waiver rule; e.g., id., 440–41; which provides that, if a defendant elects to introduce evidence after the trial court denies his or her motion for judgment of acquittal at the end of the state's case, appellate review encompasses the evidence in toto, including evidence introduced by the defendant. Accordingly, in applying the waiver rule, "we . . . look at the evidence in toto in order to review the trial court's ruling on the motion for judgment of acquittal after all of the evidence had been presented." *State* v. *Simino*, 200 Conn. 113, 118, 509 A.2d 1039 (1986).

We need not consider abandoning the waiver rule, however. Based on a review of the state's evidence only, the state had proven beyond a reasonable doubt that the defendant was guilty of larceny in the first degree. "On its merits, the defendant's claim is a challenge to the sufficiency of the evidence at the end of the state's case. Our review of the state's evidence is limited to an inquiry whether the jury could have reason-

ably concluded, upon the facts established and the infer-
ences reasonably drawn therefrom, that the cumulative
effect of the evidence established guilt beyond a reason-
able doubt." (Internal quotation marks omitted.) *State*
v. *Rutan,* supra, 194 Conn. 444, quoting *State* v. *Stepney,*
191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied,
465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984);
see also *State* v. *Haddad,* 189 Conn. 383, 387, 456 A.2d
316 (1983). We conclude that the evidence at the close
of the state's case was sufficient to sustain the state's
burden of proving the defendant guilty of larceny in the
first degree beyond a reasonable doubt. Therefore, we
do not reach the issue of whether we should abandon
the waiver rule.

## II

The trial court reasonably could have found the fol-
lowing facts. The victim is an elderly, childless widow,
whose only surviving family is a sister, Anne Shea,[2]
who, at the time in question, was a resident of a nursing
home. The victim had a close friend, Minnie Calonico,
the mother of the defendant. The victim spent most
of her time with Minnie Calonico after her sister had
become incapacitated, and Minnie Calonico and the
victim were best friends and had a very close, family-
like relationship.[3] During the early period of their friend-
ship, the victim and Minnie Calonico went to casinos
and out for meals together.

Suspicion of larceny arose after legal and financial
professionals assisting the victim discovered evidence
that the defendant was mishandling the victim's funds.
An initial review of the victim's accounts showed that

---

[2] We hereinafter refer to Shea as the victim's sister.

[3] The victim also was friendly with her neighbors, Dianne Terrace and
Thomas Terrace, who lived across the street from her on Jackson Road.
Their friendship faded, however, after the victim had moved into her sister's
condominium in a different neighborhood.

several bank accounts had been consolidated into one large account over the course of several months in 1995. Further investigation revealed that the defendant appropriated approximately $800,000 of the victim's money from that consolidated account over a period of less than three weeks through cash withdrawals and transfers into bank accounts of the defendant and her friends and family.

In early 1995, at age eighty-nine, the victim sought the assistance of her attorney, Daniel H. Dennis, Jr., to create a new will.[4] Dennis referred the victim to Richard K. Snyder, an attorney specializing in estate planning and administration for geriatric clients. Dennis expressed some concern to Snyder about the victim's ability to handle everyday financial matters. As a result, Snyder recommended to the victim that she "get some reputable professional assistance with her financial affairs" because of her age and substantial assets.[5] Upon her request, Snyder contacted the victim's accountant at the firm of Luppi, Mahon, Schulz and Company (accounting firm). Snyder suggested to Robert Boudreau, the accountant in charge of the victim's account, that the victim needed regular assistance paying bills, balancing her checkbook and making deposits. In response, Boudreau assigned one of the accounting firm's assistants, Susan Frame,[6] to help the victim with her finances on a regular basis.

[4] Dennis drafted a will for the victim in 1990. Thomas Terrace, an attorney and friend of the victim; see footnote 3 of this opinion; prepared a new will for the victim in 1994, with which she was dissatisfied. The 1994 will included a bequest of $10,000 to Minnie Calonico. The 1995 revised will reduced to $5000 the bequest to Minnie Calonico. None of the three wills contained a bequest to, or even a reference to, the defendant.

[5] Several bank accounts in the victim's name had a combined total of more than $800,000. The victim also had a substantial amount of money in the stock market.

[6] Before the trial commenced, Susan Frame had married and was known as Susan Frame Zito when she testified at trial.

Beginning in January, 1995, Frame would go to the victim's residence either weekly or every other week and sort through bills, write out checks for bills that needed to be paid immediately, show them to the victim, explain what they were for and have the victim sign them. Frame also discovered a suitcase full of stock certificates. Upon Snyder's request,[7] Charles Noble, a stockbroker, visited the victim's home, went through the securities and opened a brokerage account for her. The victim's securities were worth approximately $400,000 when Noble opened the account.

Early in their professional relationship, Frame saw evidence that the victim was suffering from some mental deterioration. Specifically, Frame noticed that the victim often misread check amounts and had difficulty signing her name. The problem intensified in the summer of 1995, when the victim became ill after suffering injuries from a fall.[8] A subsequent computerized axial tomography (CAT) scan revealed that the victim likely had suffered a stroke.[9] Just prior to this incident, in June, 1995, the victim sold her house on Jackson Road in Hamden and moved into her sister's condominium.[10] Dennis was the closing attorney for the sale of the home, and Snyder continued to play a role in administering the victim's assets. Frame also continued to assist the victim with financial matters after her move. Sometime in the summer of 1995, Minnie Calonico moved into the victim's home to assist the victim while she was recuperating from her fall and injuries resulting therefrom.

---

[7] Snyder wanted to be sure that the securities were safely registered in the names of the victim and her sister.

[8] Frame testified that the victim had spent a lot of time in bed after that incident.

[9] It was around this time that the victim started having delusions that her sister, who already had been admitted to a nursing home, was asleep in another room, and that health care workers were stealing from her, compelling her to sleep with her pocketbook.

[10] We hereinafter refer to the condominium as the victim's home.

In December, 1995, Frame went to the victim's home for one of her regular visits. Upon her arrival, she noticed what appeared to be a new automobile in the driveway.[11] When she went inside, Frame was greeted by the defendant who explained that she was Minnie Calonico's daughter and that she was there just to clean for the victim. While going through the bills that day, Frame noticed that there was an entry in the victim's checkbook that indicated that a check had been made out to the defendant. Because the writing was somewhat illegible, Frame could not tell whether the amount was $500 or $5000. Among the victim's papers, Frame also noticed a cashier's receipt in the amount of $24,039.20, dated October 4, 1995, that had been issued to a local car dealership. Knowing that the victim did not have a license to operate a motor vehicle,[12] and making the connection between the new car in the driveway and the receipt, Frame found the situation unusual. Aware of the victim's usually conservative spending habits,[13] Frame became concerned enough to speak to Boudreau when she returned to her office. Boudreau agreed that Frame should inform the victim's attorneys, namely, Snyder and Dennis, of the incident. After Frame contacted Snyder about her concerns, Snyder notified adult protective services for the elderly (protective services) and informed them of the suspicious findings.

A few weeks later, Frame returned to the victim's home to pay bills and prepare deposits. At that time,

---

[11] The new automobile was registered in the defendant's name.

[12] In 1994, the victim's license to operate a motor vehicle temporarily was revoked after the victim had been stopped by the police for driving erratically. A driver assessment evaluation conducted at Gaylord Hospital that same year resulted in the permanent revocation of the victim's license.

[13] There was testimony at trial that the victim had complained about the price of cat food when it had risen five cents, that she did not want to fix her air conditioner when it had malfunctioned during the summer because it would cost $1200, that she had worn the same clothes for many years and that she rarely had made charitable gifts or donations.

she questioned the victim about the illegible entry in her checkbook, which indicated that money had been given to the defendant. The victim did not respond, but looked at her "blankly, like she didn't understand the question." Frame met with the victim periodically throughout January, 1996. During this time, Snyder, after consulting with Frame and Barbara Sachs of protective services, arranged a meeting with the victim. Snyder also contacted Boudreau and asked that the accounting firm begin a review of the victim's bank account records.

On January 30, 1996, Frame arrived early at the victim's home for the prearranged meeting with Snyder and Dennis. The defendant and Minnie Calonico were present in the home along with the victim. While waiting for Snyder and Dennis to arrive, the victim told Frame that she no longer needed her services, but she agreed to have the accounting firm continue doing her tax returns. It was Frame's understanding that the defendant would now be taking care of the victim and her financial affairs. When the attorneys arrived, the defendant became confrontational. Frame, Snyder and Dennis all testified that the defendant was hostile and agitated, demanding to know why they were there "bothering" the victim. The defendant also said that she knew that they were there because of the $5000 that the victim had given her because the victim felt sorry that the defendant had lost her job,[14] and prodded the victim to ask the attorneys "how much this [was] . . . costing [her]." The defendant further suggested that there were other attorneys whom the victim could use, and that Snyder's and Dennis' "tenure would shortly be over . . . ."

After the visit with the victim, Snyder again contacted protective services and stated that he was "totally con-

---

[14] There was evidence, however, that the defendant had not lost her job, but had voluntarily resigned without incident in May, 1995.

vinced that [the victim] was being manipulated financially and that [he] thought it was quite urgent that they take action." Snyder became increasingly concerned in February and March, 1996, when he was denied access to the victim, always being told that she was not feeling well or that she did not want to speak with him. Frame also had trouble contacting the victim in February, 1996, but was able to arrange a meeting for tax preparation purposes in March. When Frame arrived at the victim's home for the March, 1996 meeting, she noticed overdue bills and public utility shut off notices on the dining room table, indicating that the defendant had been neglecting the victim's financial obligations.

Also, in March, 1996, Snyder received a call from Noble. Noble relayed to Snyder that the defendant had called him, claiming to represent the victim's wishes, with instructions to liquidate securities from the victim's account and deposit the proceeds into certain bank accounts for the care of the victim's sister. Snyder then contacted protective services with this new information. Barbara Sizemore from protective services went to see the victim as a result of Snyder's report. When she arrived, Minnie Calonico met her at the door and handed her an envelope on which there was a note stating that she could not come in and that she should speak to the victim's attorney, Herbert Fischer. After this incident, Sizemore made a referral to the office of the chief state's attorney and filed an application for the appointment of a conservator of the victim's estate and person.[15] Both Snyder and Sizemore were con-

---

[15] The Hamden Healthcare Center filed a similar application on behalf of the victim's sister. Fischer was contacted by the defendant and retained to represent the victim at a hearing being held to determine whether the victim needed a conservator. He testified that the defendant contacted him to oppose the appointment of a conservator for the victim's estate, stating that the victim feared it was only taking place to put her in a nursing home. The conservatorship, however, was initiated solely to protect the assets and physical well-being of the victim.

vinced that the defendant and her family had been taking advantage of the victim's deteriorating mental health for their own financial gain.

In April, 1996, the defendant telephoned Noble's office a second time, stating that the victim wanted to sell all of her investments and "invest in other things." She also complained that Noble did not send her the paperwork necessary to liquidate the account subsequent to their prior conversation. Noble told the defendant that the victim would have to pay very high capital gains taxes if she chose to liquidate the account all at once. The defendant, whom Noble heard whispering to someone in the background during their telephone conversation, ignored Noble's warnings about tax consequences and indicated that the victim still wanted to sell all of her stocks. Noble set up a meeting in early April, 1996, to discuss the liquidation of the account and the associated tax consequences. Neither the victim nor the defendant appeared at the meeting. Instead, Noble received a telephone call from the victim on the day of the meeting.[16] In a "startling strong voice," the victim demanded the money from the sale of her stocks. The victim flatly rejected Noble's claim that there would be high capital gains taxes after someone whom Noble heard talking in the background instructed her to do so.[17] Alarmed by the situation, Noble again notified Snyder. Snyder told Noble to delay taking any action on the account, informing him that the Probate Court appointed him as temporary conservator of the estate

---

[16] There were suspicious circumstances surrounding the telephone call from the victim on the day of the scheduled meeting. First, there was evidence that a younger woman claiming to be the victim called and then hung up when Noble picked up the telephone. Shortly thereafter, a second telephone call was made, but the victim was on the line when Noble picked up the telephone.

[17] Noble testified that, when he told the victim about the capital gains taxes she would be required to pay, she faltered in her speech and began talking to someone in the background.

of the victim's sister and that he might also be appointed conservator of the victim's estate at the conservatorship hearing scheduled for April 24, 1996.

Prior to the conservatorship hearing, David Esposito was appointed by the Probate Court to represent the victim.[18] Esposito visited with the victim at her home the day before the hearing. Initially, he spoke to the victim and Minnie Calonico and had a pleasant conversation. During the visit, he found the victim to be confused about why the conservatorship hearing was taking place, and that the victim was convinced that Snyder and Dennis were trying to take her money and to put her in a nursing home. After the defendant and her companion, Marcella Burch, arrived at the victim's home and Esposito informed them why he was there, they became "visibly upset" and the conversation became hostile. The defendant and Burch kept saying "[w]e don't need you, we have a lawyer." The victim, however, did not seem to recall meeting with Fischer the day before. At one point in the conversation, the victim said that she gave the defendant $700 to buy a car. The defendant corrected her and said that the amount was $700,000. Only fifteen minutes after the defendant had arrived, Esposito felt that he should leave as "the level of hostility was reaching the danger zone." Alarmed by this dialogue involving the defendant, and concerned about the victim's seemingly confused state of mind, Esposito articulated in his report to the Probate Court that he "was absolutely certain that [the victim] was being financially exploited and that she desperately needed a conservator of [her] estate . . . ."

Snyder arranged for an evaluation to be performed by Alan Siegal, a psychiatrist who specializes in geriatric

[18] Esposito testified that, pursuant to statute, a Probate Court judge must appoint an attorney when a conservatorship is being proposed and the subject of the conservatorship "is either unable or unaware that [he or she] need[s] an attorney."

psychiatry with a concentration in the study of illnesses such as Alzheimer's disease and dementia, prior to the conservatorship hearing in order to prove that the victim had suffered from dementia that could be traced back to 1994. Siegal reviewed 1994 and 1995 medical records from the Hospital of Saint Raphael and a report from a 1994 Gaylord Hospital driver assessment evaluation of the victim, the results of which led to the permanent revocation of the victim's license to operate a motor vehicle. He also performed an in home assessment on April 22, 1996, in order to determine the victim's mental competency. Siegal administered a Folstein test[19] and determined that the victim's score put her in a range of "mild to moderate" dementia. He found the victim to be mildly disoriented and paranoid. It was Siegal's opinion that the victim had been suffering from some form of dementia beginning in at least 1995, after she likely had suffered a stroke, and possibly since as early as her hospitalization in 1994, when discharge reports of the Hospital of Saint Raphael, where the victim had been admitted, indicated that the victim was suffering from "moderate cerebral atrophy," also known as organic brain syndrome or dementia. In light of these findings, Siegal opined that the victim was not only unaware of the extent of her assets and their current disposition, but also that she was being unduly influenced by the defendant with regard to the distribution of those assets. Siegal concluded that the victim's condition and the surrounding circumstances necessitated the appointment of a conservator for the victim and her estate.

The defendant also made arrangements for the representation and evaluation of the victim before the conser-

---

[19] According to Siegal's testimony, the Folstein test, or Folstein mental status questionnaire, "is a thirty point cognitive rating assessment instrument" that tests a person's capacity to concentrate. The higher the score of the person taking the test, the better his or her cognitive ability.

vatorship hearing. The defendant requested that Jeremy August, a psychiatrist, participate as an independent physician for the purposes of the hearing.[20] August met with the victim daily for approximately one week before the hearing and saw her for the last time on the date of the hearing. August concluded that the victim suffered from mild organic brain syndrome.[21] August concluded that: (1) the victim's mental capacity had improved over the week that he evaluated her; (2) it was difficult to determine what her mental state had been over the past two years; and (3) she did have the capacity to make gifts to the defendant. He did not, however, review the victim's medical records from the Hospital of Saint Raphael or the Gaylord Hospital records from 1994. Consequently, he did not know that the victim had failed a driver assessment evaluation test in 1994 or that she probably had suffered a stroke in 1995. When August was informed of Frame's accounts of the victim's delusions and her regular state of confusion, he agreed that such symptoms could signify severe organic brain syndrome. August also was unaware of the full extent of the bank transactions involving the defendant until the conservatorship hearing. When August was confronted with the nature of the transfers, he commented that he was "impressed by the number of transactions" and acknowledged that he would question whether a person with even mild organic brain syndrome "would . . . be capable of organizing and directing money transfers of that magnitude within [such a short] time frame . . . ."

---

[20] August got involved when he was contacted by Kathryn Bonese, the psychiatrist whom the defendant originally contacted to evaluate the victim. Although there is some question as to whether the defendant hired August, August did forward a bill to the defendant after he had rendered his services.

[21] August agreed with Siegal that mild organic brain syndrome is the functional equivalent of mild dementia. August indicated, however, that the difference between the two conditions is that mild organic brain syndrome could be subject to some reversibility.

On April 24, 1996, a hearing was held to determine whether a conservator should be appointed for the victim. The victim testified at the hearing, appearing frail and confused. When Fischer questioned the victim about giving gifts to the defendant, she stated only that she had bought the defendant a car for $350,000.[22] This testimony, coupled with evidence regarding the bank transfers, convinced the Probate Court judge that the victim required a conservator. Consequently, Snyder was appointed conservator of the victim's estate, and Dennis was appointed conservator of her person and the person of the victim's sister.

Concerned for the victim's physical well-being, Snyder made arrangements with Victoria Austin, a social worker from the Hamden Healthcare Center, to remove the victim from her home and arrange for a physical evaluation. On two occasions, Snyder and Austin went to the victim's home to remove the victim, once with a representative of the Visiting Nurse Association and again with someone from protective services. On both occasions, they were turned away. After contacting the Hamden police department, Snyder and Austin were advised to try again before involving police officers. They were able to get into the victim's home the third time, however. The victim was at home with Minnie Calonico and agreed to accompany Snyder and Austin.[23] They took the victim to the Hamden Healthcare Center, had her admitted and arranged for a full medical evaluation.

Once the victim safely was removed from the defendant's influence, Snyder wrote to the office of the chief state's attorney about his concern for the victim's assets. Additionally, Snyder served all of the victim's

---

[22] Fischer testified that this testimony had played a part in changing his opinion regarding the victim's competency.

[23] They encountered some protest from Minnie Calonico, who had been instructed not to let anyone into the victim's home.

financial institutions with documentation of his appointment as conservator and requested that certain information be forwarded to him and the victim's accountant. Snyder contacted the accounting firm and requested that it continue its analysis of the transactions that had occurred since 1995 based upon new information that was being provided by the various financial institutions. Snyder asked the accounting firm to determine how much money had been transferred, where and when it was deposited and how much remained as of April, 1996.

Boudreau prepared a report for Snyder concerning the status of the victim's accounts. Boudreau reviewed records dating from January 1, 1995, through at least June, 1996. The records of several different banks were analyzed, including Centerbank,[24] First Union, formerly First Fidelity and Union Trust, Bank of Boston, New Haven Savings Bank, Fleet Bank, Dime Savings Bank,[25] American Savings Bank[26] and Shawmut Bank. Boudreau's review of the records from all of the banks concentrated on "transactions involving deposits and transfers of [the victim's] accounts into one large account . . . at Centerbank . . . ."[27] He also looked at bank transactions involving cash withdrawals and transfers of funds from the main Centerbank account

[24] Nine different Centerbank accounts were reviewed. The Centerbank records showed accounts held in the names of several people other than the victim, including the defendant, Burch, Leo Calonico, the defendant's brother, and his wife, Jennifer Calonico, and one account in Leo Calonico's name only.

[25] The two accounts at Dime Savings Bank were in the defendant's name and had been supplemented with transfers from one or more of the victim's accounts.

[26] The two American Savings Bank accounts reviewed were joint accounts owned by the defendant and Marcella Burch.

[27] Centerbank account no. 750343337 was the victim's account and was opened in June, 1995, with a deposit of $86,978.46. That account ultimately amassed $833,145.03 after the defendant had made a number of large deposits and transfers from the victim's various bank accounts.

into the defendant's personal accounts and accounts held in the names of related third parties. Boudreau created a flowchart to depict both the victim's and the defendant's account activities. The flowchart illustrated the manner in which most of the victim's money had been consolidated into one account, then rapidly withdrawn over approximately a three week period, either in cash withdrawals, transfers to the defendant's accounts or transfers to the defendant's friends and family. From November 30, 1995, until December 19, 1995, the defendant, by various means, transferred, withdrew, deposited and gifted almost $800,000 from the victim's Centerbank account, an account that the defendant had created by consolidating all of the victim's assets. Additional facts will be set forth as necessary.

### III

We employ a well established standard of review when a defendant challenges a trial court's finding of guilt on the ground of insufficient evidence. "In reviewing [a] sufficiency [of the evidence] claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the [finding of guilt]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trial court] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State v. Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State v. Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989). Furthermore, any challenge to the sufficiency of the evidence support-

ing a conviction will be construed in favor of sustaining the verdict. See, e.g., *State* v. *Montgomery*, 254 Conn. 694, 732–33, 759 A.2d 995 (2000).

The defendant claims that the trial court erred when it found that the victim did not have the mental capacity knowingly and voluntarily to give the money at issue to her as a gift. We disagree. General Statutes (Rev. to 1995) § 53a-122 (a) provides in relevant part that "[a] person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ." General Statutes § 53a-119 provides in relevant part that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." The elements of larceny include: "(1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Huot*, 170 Conn. 463, 467–68, 365 A.2d 1144 (1976), quoting *State* v. *Banet*, 140 Conn. 118, 122, 98 A.2d 530 (1953). Consequently, "a conviction for larceny [cannot] stand . . . [when the] property is taken with the knowing consent of the owner . . . ." *State* v. *Marra*, 174 Conn. 338, 342, 387 A.2d 550 (1978).

When the state claims that there is no knowing and voluntary consent to the taking of property because of the property owner's mental incapacity, mental incapacity may be considered by the trier of fact as a "theory . . . demonstrat[ing] at least one of the elements of the crime, [namely] failure to consent to the taking and carrying away" notwithstanding that mental capacity is not, itself, an element of larceny. *People* v. *Cain*, 238 Mich. App. 95, 128, 605 N.W.2d 28 (1999); see also *People*

v. *Camiola*, 225 App. Div. 2d 380, 380–81, 639 N.Y.S.2d 35, appeal denied, 88 N.Y.2d 877, 668 N.E.2d 422, 645 N.Y.S.2d 451 (1996) (where defendant stole significant assets from elderly, senile victim over two year period, jury may consider victim's mental capacity to form consent in determining trespassory nature of taking). Furthermore, a "victim's nonconsent to a transfer of property can be proven by circumstantial evidence . . . [which] may include evidence that the defendant knew the victim lacked the mental capacity to consent to the taking of his or her property." (Citation omitted.) *Deranger* v. *State*, 652 So. 2d 400, 401 (Fla. Dist. Ct. App. 1995).

Although neither § 53a-122 (a) (2) nor § 53a-119 specifically enumerates lack of consent as an element of larceny in the first degree, we agree with New York's interpretation of N.Y. Penal Law § 155.05 (1),[28] a larceny statute containing language similar to that of § 53a-119, that "a donative victim's inability to consent to [a] taking [is a factor] . . . properly considered in the context of a traditional understanding of the larceny statute . . . ." (Citations omitted.) *People* v. *Camiola*, supra, 225 App. Div. 2d 380–81. Other states employ a similar interpretation of their own larceny statutes. For example, in Alabama, "even without an express statutory provision . . . mental deficiency on the part of the victim, which is known or should be known to the defendant, can render ineffective the apparent consent by

[28] Section 155.05 of New York's Penal Law provides in relevant part that "[a] person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." N.Y. Penal Law § 155.05 (1) (McKinney 1999).

In considering New York's larceny statute for this analysis, we note that our legislature relied upon New York's penal laws when the legislature revised the Connecticut Penal Code in 1969. *State* v. *Woods*, 234 Conn. 301, 310, 662 A.2d 732 (1995); see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 11.

the victim in a prosecution for theft [under the relevant statute]." *Gainer* v. *State*, 553 So. 2d 673, 679 (Ala. Crim. App. 1989); cf. *Lucas* v. *State*, 183 Ga. App. 637, 642, 360 S.E.2d 12 (1987); *People* v. *Cain*, supra, 238 Mich. App. 128–29.

In the present case, the trial court, as the trier of fact, found that the evidence established beyond a reasonable doubt that the victim had lacked the capacity to consent to the bank transactions. The trial court properly concluded, therefore, that the defendant, with intent to deprive the victim of her property and permanently to appropriate the same to herself or a third person, wrongfully had taken and obtained the victim's property without her knowing consent, satisfying the elements of larceny. The defendant argues that there was insufficient evidence to prove the victim's mental incapacity, and, consequently, that the state did not sustain its burden of proving that the transfer of the victim's assets was wrongful, i.e., without her consent. The defendant contends, therefore, that, without proof of wrongfulness, she cannot be guilty of larceny as defined by § 53a-119. The state argues that the victim's deteriorating mental state rendered her incapable of understanding the nature of the transactions being facilitated by the defendant and that, consequently, the victim's inability to consent renders the defendant's taking of the victim's assets wrongful. We agree with the state.

It is true that there is a presumption that human beings are ordinarily of sound mind, but that presumption may be rebutted. Cf. *State* v. *Reddick*, 197 Conn. 115, 133, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). The state had the burden of proving that the victim was not of sound mind and that she was, therefore, incapable of consenting to a transfer of her property. Viewing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that there is suffi-

cient evidence in the record to demonstrate that the victim was incapable of knowingly consenting to the transfer of her assets due to mental incapacity, and that the victim's mental incapacity would have been apparent to the defendant. In reviewing the evidence in the record, we conclude that the trial court reasonably could have found that the victim's mental incapacity rendered her incapable of consenting to the defendant's financial stratagem and that the defendant was aware of the victim's mental incapacity during the extended period of time when she plundered the victim's assets. We conclude, therefore, that the trial court reasonably could have concluded that the taking was nonconsensual and wrongful.

The evidence of the victim's mental incapacity can be summarized as follows. As early as 1994, the victim began to have cognitive difficulties. In approximately January or February, 1994, the victim's license to operate a motor vehicle temporarily was revoked because she had operated her car erratically and had failed to exhibit basic traffic safety. After subsequently failing a driver assessment evaluation administered at Gaylord Hospital, the victim's license was revoked permanently.[29] Janine Stancanelli, the occupational therapist conducting the driver assessment evaluation, testified at trial that the victim had been unable to "comply"

---

[29] Thomas Terrace, the victim's former neighbor and an attorney, assisted the victim during the process of trying to regain her license. They were unsuccessful. Records from Gaylord Hospital describe how the victim required verbal cues to locate door handles and physical assistance to start the car. The victim also drove excessively slow, made wide right turns, crossing into traffic, and had difficulty recalling verbal directions. Additionally, she made several unsafe left turns in front of oncoming traffic and stopped the vehicle at every side road and green light. The records also report that, at one point, the victim stated that her right shoe was loose and, thereafter, stopped the car in the middle of moderate traffic to adjust it. Finally, when the victim went to park the car, she hit a metal post that served as a visual guide and tried to exit with her seatbelt still fastened and the keys in the ignition.

with the test, even after going over directions more than one time, because "it was too hard for her to follow the directions and understand and process the information."

Records from the Hospital of Saint Raphael relied upon by Siegal also indicate that the victim had been subject to some form of mental incapacity as far back as 1994. The victim's discharge summary states that the victim was suffering from "moderate cerebral atrophy" and "organic brain syndrome," also known as dementia.[30] Siegal testified that dementia affects a person's executive functioning abilities, thereby decreasing his or her capacity to handle simple tasks in life.[31] Siegal also testified that age is a factor in the diagnosis of dementia because it is an illness that increases with age. Siegal also saw evidence of dementia in his review of the Gaylord Hospital driver assessment evaluation of the victim. Additionally, the results of a CAT scan performed at the Hospital of Saint Raphael in 1995 after the victim had suffered injuries from a fall indicate that the victim likely had suffered a stroke at that time. According to Siegal, a stroke could have affected the victim's executive functioning and, therefore, would be consistent with Siegal's diagnosis in April, 1996, that the victim had been suffering from some form of dementia for a significant period of time. Siegal testified "with reasonable medical certainty" that "the condition of mild dementia [that he had] observed on April 22, 1996, existed for some time prior to [that date] . . . [f]or a period at least [commencing in] July of 1995 and proba-

---

[30] Siegal defined dementia as "an overall term that refers to impairments in cognitive functioning to such a degree that it [sic] interferes with an individual's day-to-day existence." Dementia is usually thought of in stages of mild, moderate or severe.

[31] Siegal testified that "patients [suffering from dementia] . . . have impairments in executive functioning, their ability to plan for the future [and in] deal[ing] with instrumental activities of daily living, which includes [sic] paying bills [and] handling their finances [among other things]."

bly [1994] based on the discharge summary from [the Hospital of] Saint [Raphael] . . . ."

There was also testimony from legal and accounting professionals that they had observed a significant decline in the victim's mental capacity during the course of their relationship with her.[32] As stated previously, Frame testified that the victim often was confused about check amounts and more concerned with her cats than her finances. Frame also testified that the victim had difficulty signing her name and reading checks and bills and had delusions that people were stealing from her, causing her to sleep with her pocketbook. Frame further testified that the victim had told Frame that the victim's sister slept over in a spare bedroom one night, when, in actuality, her sister resided in a nursing home. Snyder and Dennis testified that they noticed the victim's mental deterioration the day she came to see them about a new will. Thus, as early as January, 1995, they determined that she needed assistance with her finances.

Esposito found the victim to be confused and disoriented at their first meeting as well. During that meeting, the victim manifested signs of paranoia by indicating that "some men were trying to put her in a nursing home and that they had taken her money away." According to Esposito, she also thought that she had given the defendant only $700 to buy a car, yet remained quiet when the defendant said it was "$700,000." Esposito became more convinced of the victim's mental incapacity on the day of the conservatorship hearing when he heard the victim testify that she had purchased a car for the defendant for $350,000. Noble also found the

---

[32] "It is well settled that a nonexpert witness may testify as to his [or her] impression of another's mental or emotional state if that opinion is reliable and based on the [witness'] observations." *State* v. *Spigarolo*, 210 Conn. 359, 371, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

victim to be confused at their first meeting, basing his finding on the fact that the victim was unaware of the sizeable investments at her disposal. Noble testified that, later in their relationship, the victim had begun acting out of character, as though someone was telling her what to say. According to Noble, the victim seemed convinced that Noble was trying to take her money. When the victim began making unreasonable requests regarding her stocks, it was apparent to Noble that it was the defendant, and not the victim, who sought to liquidate the victim's accounts. Once Snyder learned from accounting professionals that the victim's bills were being neglected and that a sizeable portion of the victim's funds were being withdrawn by the defendant, he was certain that the defendant was manipulating the victim in order to obtain her assets.

The witnesses' testimony as to the victim's mental incapacity, coupled with evidence that the defendant was siphoning the victim's accounts, supports the trial court's conclusions that: (1) the victim lacked the capacity to understand the transfers or consent to them; and (2) the defendant had been unduly influencing the victim in the transfer of her assets. It is a well settled principle that "[t]he determination of a witness' credibility is the special function of the [trier of fact, which, in the present case, is the] trial court." (Internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 227, 673 A.2d 1098 (1996). The trial court had the opportunity to observe the witnesses and to assess their credibility, and reasonably could have relied on the testimony of the professionals who tried to protect the victim's assets. As Siegal pointed out, the victim was suffering from dementia, which affects simple executive functioning. Thus, the trial court reasonably could have determined that, in light of the victim's condition, the victim lacked the capacity to understand transactions of this "magnitude, frequency and irregular nature." *People* v. *Spiegel,*

48 N.Y.2d 647, 648–49, 396 N.E.2d 472, 421 N.Y.S.2d 190 (1979). The testimony of the witnesses reasonably could have established beyond a reasonable doubt that, in the trial court's words, the victim "lacked the mental capacity to make any reasonable decision with respect to her assets, her estate and the distribution of those assets and estates, and that she did not have the mental capacity to make gifts."

## IV

Having determined that the trial court reasonably could have concluded beyond a reasonable doubt that the victim was mentally incapable of consenting to the transfer of her assets and that the defendant was aware of that fact, we now focus on the evidence that establishes the defendant's intent to deprive the victim of her assets permanently in violation of §§ 53a-122 (a) (2) and 53a-119. "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. "An 'owner' [is] any person who has a right to possession superior to that of a taker, obtainer or withholder." General Statutes § 53a-118 (a) (5); see *State* v. *Morant*, 242 Conn. 666, 671, 701 A.2d 1 (1997). In order to sustain a conviction under Connecticut's larceny provisions, therefore, we require proof of the existence of a felonious intent to deprive the owner of the property permanently. See *State* v. *Marra*, supra, 174 Conn. 342. "It has been firmly established as a constitutional right that the state bears the burden of proof beyond a reasonable doubt on each essential element of the crime charged. . . . [Thus, since a] specific intent [to deprive an owner permanently of his or her property] is an essential element of larceny . . . [it] must be proved beyond a reasonable doubt by the state." (Citations omitted.) *State* v. *Fernandez*, 198 Conn. 1, 20, 501 A.2d 1195 (1985). We

review the evidence presented at trial, and the reasonable inferences drawn therefrom, in a light most favorable to sustaining the trial court's finding of guilt. *State* v. *Sivri*, supra, 231 Conn. 126.

The substantial evidence recounted previously in this opinion and the nature of the defendant's handling of the victim's accounts point to an intent on the part of the defendant permanently to deprive the victim of her assets. It is evident that the defendant attempted to isolate the victim from those individuals who were concerned for the security of her assets, namely, Frame, Snyder and Sizemore of protective services. Furthermore, once a conservatorship hearing was scheduled, the defendant did everything in her power to contest the proceedings. She retained an attorney to oppose the appointment of a conservator, retained a physician to evaluate the victim and even went as far as "coaching" the victim on her pending testimony regarding the nature of, and reasons for, the transfer of her assets. Furthermore, when the defendant faced opposition from the victim's attorneys and individuals seeking to protect the victim's assets, she became alarmingly hostile and defensive.

Bank records, however, paint the most vivid picture of the way in which the defendant wrongfully gained control of the victim's assets. The defendant, over a period of time, transferred $833,145.03 of the victim's assets from various accounts and sources into one of the victim's accounts at Centerbank. From that cumulative Centerbank account, in a matter of twenty days, the defendant made cash withdrawals and transferred almost $800,000 to herself, accounts in her name and accounts in the names of related third parties. Between November 30, 1995, and December 19, 1995, the defendant withdrew, transferred and gifted approximately $794,000 from the Centerbank account that she had created with the victim's funds. That $794,000 was dis-

bursed in the following manner: $75,000 was deposited into an account at New Haven Savings Bank in the defendant's name; $150,000 was deposited into a First Fidelity bank account in the defendant's name; $145,800 was deposited into two separate accounts at Dime Savings Bank, both in the defendant's name; $320,491.07 was deposited into an account at American Savings Bank in the name of the defendant and Burch; $40,008.93 was deposited into two separate Centerbank accounts, one in the name of the defendant's brother, Leo Calonico, the other in the name of Leo Calonico and his wife, Jennifer Calonico; and the defendant withdrew $32,100 in cash. Additionally, $30,500 was withdrawn in the form of a cashier's check payable to a car dealership for the purchase of an automobile that ultimately was registered in the defendant's name. The defendant purchased a home, held in her name and the name of Burch, with at least some of the appropriated funds. The defendant also bought a used car for Katherine Terry, Burch's daughter. Additionally, some of the money withdrawn in cash remains unaccounted for. In March, 1996, the main Centerbank account that the defendant had created with the victim's money was frozen with a remaining balance of only $40,472.86.

We conclude that the trial court reasonably could have found that the victim's money was transferred with the specific intent to deprive the victim of her assets in violation of §§ 53a-122 (a) (2) and 53a-119. "Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Citations omitted.) *State* v. *Kurvin*, 186 Conn. 555, 568, 442 A.2d 1327 (1982). "Intent . . . can be inferred both from the defendant's conduct and his [or her] statements at the time of the

crime . . . [and therefore] whether such an inference should be drawn is properly a question for the [trier of fact] to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 212 Conn. 31, 45–46, 561 A.2d 897 (1989). According to General Statutes § 53a-118 (a) (3), "deprive" means "(A) to withhold [property] or cause it to be withheld from [the owner] permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (B) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property."

The defendant's intent to deprive the victim of her assets was demonstrated, not only by the victim's obvious inability to consent to the transfers, but also by the lengths to which the defendant had gone to gain control over the victim's assets and appropriate them for her own permanent use. We are satisfied that the status of the victim's assets as summarized by the state proves that the defendant intended to deprive the victim of her assets permanently and use them solely for the benefit of herself, her friends and family.

Therefore, the trial court reasonably could have found, on the basis of the evidence presented at trial, that the defendant intended permanently to appropriate the victim's assets for her own use, that the victim was incapable of giving consent and that the defendant was aware of the victim's mental incapacity. Consequently, the trial court reasonably could have concluded that the state had proven all of the elements of §§ 53a-122 (a) (2) and 53a-119 beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.