******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RAFAEL ORTIZ
## (SC 20348)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of
the victim, the defendant appealed to this court, claiming, inter alia,
that he was deprived of his due process right to a fair trial as a result
of prosecutorial impropriety during the state's rebuttal argument. The
victim and his friend, L, who had been using phencyclidine (PCP), drove
to an area in Hartford to purchase more PCP. After L parked the car,
the victim exited the car while L remained in the car, and the victim
approached the defendant. The victim and the defendant engaged in
discussion concerning drugs, after which the victim returned to the car.
The defendant then approached the car, aimed a gun at the victim, and
shot the victim through the front passenger window. L and two other
individuals, I and R, the latter of whom was spending time and smoking
PCP with the defendant at and around the time of the shooting, witnessed
the events as they unfolded. L, I, and R each identified the defendant
in a photographic array as the perpetrator. R thereafter provided a
written statement to investigators and testimony to a grand jury implicat-
ing the defendant in the murder. Prior to the defendant's trial, however,
R indicated to defense counsel that she wanted to recant both her
written statement and grand jury testimony. The state subsequently
discovered that the defendant had sent text messages to R while he
was incarcerated in an attempt to influence her testimony. Insofar as
this evidence could have demonstrated the defendant's consciousness
of guilt, both defense counsel and the state entered into an agreement
pursuant to which the prosecutor, on direct examination of R, would
question her about whom she was with and what she saw on the night
of the murder but would not question her about her communications
with the defendant while he was incarcerated. Pursuant further to that
agreement, defense counsel would limit his cross-examination of R to
whether R was using PCP on the night of the murder. The prosecutor and
defense counsel proceeded to examine R consistent with the agreement.
During closing argument, however, defense counsel stated that, if the
jury felt that he made a tactical mistake by not cross-examining R, it
should not hold that against the defendant. During his rebuttal argument,
the prosecutor responded by stating that there was no question about
who R was with and what she saw, and that defense counsel "didn't
even [cross-examine] her on any of that." *Held*:

1. The defendant could not prevail on his claim that the prosecutor's rebuttal
argument referencing defense counsel's failure to cross-examine R as
to certain issues violated the intrinsic character of the parties' agreement
regarding R's testimony and, therefore, constituted prosecutorial impro-
priety that deprived him of his right to a fair trial: this court could not
conclude that, even if the prosecutor's argument was improper, that
impropriety deprived the defendant of a fair trial, as the prosecutor's
argument was brief, defense counsel did not object to it or ask the trial
court to take any curative measures, and defense counsel invited the
prosecutor's argument to some extent, as it was only after defense
counsel raised the issue by arguing that the jury should not draw an
adverse inference from his decision not to cross-examine R more thor-
oughly that the prosecutor commented on the issue; moreover, the
alleged impropriety was relatively minor, as the jury likely would have
noticed defense counsel's unusually truncated cross-examination of R,
even without the prosecutor's argument, and, although the alleged impro-
priety related to R's credibility, an important issue in the case, the state's
case was not dependent on R's testimony, as L's and I's testimony was
mostly consistent with R's testimony, and both L and I were also familiar
with the defendant prior to the shooting; accordingly, the state's case
was not so weak that there was a reasonable probability that the verdict
would have been different in the absence of the alleged impropriety.

2. The trial court did not abuse its discretion in precluding defense counsel from impeaching L and I with evidence of certain prior felony convictions and in requiring two of I's prior convictions to be referred to only as unnamed felonies punishable by more than one year of imprisonment: the trial court properly excluded evidence of L's 2006 convictions of possession of narcotics and failure to appear in the first degree, and I's 2004 and 2005 convictions of sale of a controlled substance, as each of those convictions was at least thirteen years old at the time of trial, none was directly probative of the witnesses' veracity, and, therefore, the probative value of that evidence was diminished and outweighed by the remoteness of the convictions; moreover, the trial court properly allowed defense counsel to refer to I's 2017 convictions of second degree assault and violation of a protective order only as unnamed felonies, as neither conviction bore directly on I's veracity, and, therefore, the court's ruling avoided unwarranted prejudice to I that might have arisen if counsel referred to those convictions by their specific names.

3. The defendant could not prevail on his claim that the trial court improperly had declined to provide the jury with his requested instruction that he was not obligated to present any evidence and that the jury could not draw any unfavorable inference from his decision not to do so; it was not reasonably possible that the jury was misled by the trial court's failure to give such an instruction, as the substance of the requested instruction was subsumed within and implicit in the court's preliminary and final instructions on the defendant's option to testify, the presumption of innocence, and the state's burden of proof.

4. The trial court properly declined the defendant's request to include the word "conclusively" in its jury instruction on the use of evidence of the defendant's uncharged misconduct: although the defendant's request was based on language set forth in instruction 2.6-5 of the model criminal jury instructions on the Judicial Branch website, which provides that a jury may consider evidence of a defendant's uncharged misconduct only if it believes it and, then, only if it finds that the evidence "logically, rationally and conclusively" supports the issue or issues for which it was offered by the state, the model instruction was an incorrect statement of the law insofar as it required a jury to find that uncharged misconduct "conclusively" supports the issue for which it is offered; moreover, the court properly declined to instruct the jury that it could consider the defendant's prior misconduct evidence only if it found that it conclusively supported the state's theory as to the defendant's motive, as motive is not an element of the crime of murder, and the court properly instructed the jury that, even if it credited certain testimony that the defendant was engaged in the sale of drugs on the night of the murder, the jury could consider that evidence only if it found that it logically and rationally supported the state's theory of motive.

Argued January 10—officially released June 14, 2022

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gold, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *John F. Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Rafael Ortiz, appeals[1] from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a).[2] The defendant claims that (1) prosecutorial impropriety deprived him of his right to a fair trial, (2) the trial court committed evidentiary and constitutional error by precluding defense counsel from using certain prior felony convictions to impeach two of the state's witnesses, and (3) the trial court erred in its charge to the jury. We disagree with each of these claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On the evening of June 10, 2003, the victim, Benjamin Baez, Jr., and his friend, Enrique Lugo, were "hanging out" and smoking phencyclidine (PCP). Shortly before midnight, Lugo drove the two men in his car to Main Street in Hartford, near Salvin Shoes, to buy more PCP. Once there, the victim got out of the parked car while Lugo remained in it. Shortly after the victim returned to the car, Lugo saw the defendant, whom he had known for many years and considered a friend, approach the car, aim a gun at the victim, and shoot the victim through the front passenger side window. After the shooting, Lugo rushed the victim to Saint Francis Hospital and Medical Center, where he was later pronounced dead.

Wilbur Irizarry and Lisa Rosario also witnessed the shooting.[3] Irizarry and his cousin had gone to Main Street to "hang out" with friends in front of Bashner's Liquors, down the street from Salvin Shoes. When they arrived, Irizarry noticed that the defendant, whom he knew as "Felo," was there with a man who went by the name "Lu-Rock." Although Irizarry was aware that the defendant sold drugs, it was unusual to see him doing so at this location. Irizarry heard the defendant arguing with another man whom Irizarry did not know but who was later identified as the victim. Initially, he could not hear what the men were arguing about. As he got closer, however, he heard the victim ask the defendant, "[Felo], can you give me some work?" Irizarry, who previously had been involved in the sale of drugs, understood this to mean that the victim was asking the defendant to "give [him] some drugs so [that he could] make some money." In response, Irizarry heard the defendant say that "he wasn't going to give him [any]," to which the victim replied that he was "going to rob [the defendant] anyways." Irizarry then watched the victim walk toward a car that was double parked a short distance away and get in the front passenger seat.

Because the victim and the defendant were "not talking friendly," Irizarry "figure[d] something [was] going to happen" and decided to leave. While walking away,

Irizarry looked over his right shoulder and saw the defendant rush over to his vehicle, open the front passenger door, and reach inside for something. He then saw the defendant walk to the front passenger side of the car in which the victim was seated, stop approximately three to four feet away, extend his arm, and shoot the victim.[4] After hearing the shot, Irizarry and his cousin jumped into their own vehicle and sped away. Irizarry did not report the shooting at the time because he was afraid that, if he contacted the police, then what "happened to [the victim] . . . [would] happen to [him]."

Rosario was with the defendant on the night of the murder. She, her sister, and her cousin had spent the evening driving around Hartford with the defendant—who was driving his friend "Lu-Rock's" vehicle—drinking, smoking PCP, and generally "having a good time." On Main Street, across from Salvin Shoes, the defendant exited the vehicle, while Rosario and the other women remained in it. Rosario later heard the defendant arguing loudly with the victim, whom she knew as "Benji." Subsequently, she saw the defendant fire a gun into the car in which the victim was seated. After the shooting, the defendant got back into his own vehicle, and he and Rosario immediately left the scene. Rosario never reported the shooting to the Hartford police because she was afraid.

The day after the shooting, police officers searched Lugo's car, discovered a defect in the right front passenger seat, and thereafter found and seized a .40 caliber lead projectile from the seat cushion. In an effort to determine the trajectory that the bullet had traveled from the time it left the weapon until the time it came to its resting point or, in other words, to determine the angle from which the bullet had been fired into Lugo's car, the officers placed "trajectory rods" between two fixed points—namely, the location where the bullet entered the seat and the location where the bullet ultimately rested. On the basis of these points, coupled with the position of the entry and exit wounds found on the victim's body and the presence of gunpowder on the shirt that the victim had been wearing when he was killed, the officers and examiners from the state forensic science laboratory concluded that the bullet had been fired into the victim at close range—approximately two feet—and from an angle slightly over the car's door frame.

Despite their best efforts, the police were unable to develop any viable leads, and the case soon went cold. In 2015, however, investigators from the cold case unit of the Office of the Chief State's Attorney (cold case unit) learned that Lugo, Irizarry, and Rosario were all present when the shooting occurred. After all three witnesses identified the defendant in a double-blind, sequential photographic array procedure, an investiga-

tory grand jury was convened pursuant to General Statutes § 54-47c.[5] Between December 2, 2015, and April 22, 2016, the appointed grand juror heard testimony and received exhibits. On May 24, 2016, the grand juror found probable cause to believe that the defendant had murdered the victim.

Following his arrest, the defendant pleaded not guilty and elected a trial by jury. A trial subsequently was held, after which the jury found the defendant guilty of murder. On September 16, 2019, the court sentenced the defendant to fifty years of imprisonment, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We begin with the defendant's claim that he was denied his due process right to a fair trial due to prosecutorial impropriety. Specifically, the defendant contends that the prosecutor engaged in impropriety during his rebuttal closing argument when he made reference to defense counsel's failure to cross-examine Rosario. The defendant argues that the prosecutor's argument violated the "intrinsic character" of an agreement between defense counsel, William F. Dow III, and the state, whereby Dow agreed to limit his cross-examination of Rosario to a single question in exchange for the state's promise not to introduce highly damaging consciousness of guilt evidence that had recently been revealed by Rosario. The defendant further contends, in the alternative, that, if the prosecutor's argument did not rise to the level of a due process violation, this court should grant the defendant a new trial pursuant to its inherent supervisory authority over the administration of justice. The state responds that, even assuming arguendo that the prosecutor's argument violated the parties' agreement, it did not deprive the defendant of a fair trial and that exercise of this court's supervisory authority is unwarranted under the circumstances of this case. We agree with the state.

The following additional facts are relevant to our resolution of this claim. As we previously indicated, although Rosario witnessed the victim's murder, she did not come forward until contacted by the cold case unit in December, 2015. Rosario was initially hesitant to speak with investigators but ultimately agreed to provide a written statement and testimony to the grand jury implicating the defendant in the victim's murder. On the day that she was scheduled to testify at trial, however, Dow informed the court that, in November, 2018, and again on February 4, 2019—just days before the start of the defendant's trial—Rosario had phoned his office indicating that she wanted to recant her prior statement and testimony. According to Dow, Rosario stated that investigators had pressured her into implicating the defendant in the victim's murder and that, contrary to what she previously had told them, she was

not with the defendant on the night in question and did not see him shoot the victim. Dow provided the court with a copy of a recording and transcript he had prepared of Rosario's February 4th recantation, after which the court called a recess to allow the prosecution to investigate the circumstances surrounding the alleged recantation.

Later, the court noted for the record that prosecutors had met with Rosario during the recess and elicited from her a wealth of information that they believed explained her phone calls to Dow. The court further noted that the parties had reached an agreement regarding Rosario's testimony. It then asked Andrew Reed Durham, one of two prosecutors assigned to the case, to "place on the record the type of information that [he was] intending to offer in [his] examination . . . of . . . Rosario, that [he] allege[d] bore on her attempted recantation and that may have led to further incriminating information being elicited regarding the defendant in the nature of consciousness of guilt." Durham responded that, during the recess, Rosario had admitted to calling Dow and to recanting her prior statement and testimony. Durham stated that Rosario had told him that, in the fall of 2018, the defendant's close associate, Angel Rodriguez, also known as Lu-Rock, whom Rosario knew to be involved in gang activity and the sale of drugs, had contacted her via cell phone and asked that she download an encrypted cell phone application called "Wickr," which "allows people to text message back and forth with one another, and the text messages are automatically deleted, thus not leaving a trail of those conversations." Even though the defendant was incarcerated and should not have been in possession of a cell phone, Rodriguez informed Rosario that she would be receiving text messages from him through Wickr, and Rosario did in fact receive numerous messages from the defendant. Although the messages were not overtly threatening—most were of a sexual nature—they "repeatedly suggest[ed] to her that she should say that she wasn't [with the defendant on the night of the murder] . . . ." When Rosario expressed concern to the defendant and Rodriguez that she could be charged with perjury if she changed her grand jury testimony, they "assured her that they would take care of her" and that "[t]hey weren't going to hang her out to dry."

Durham further stated that the state was prepared to introduce evidence that prison officials had confiscated an illegal cell phone from the defendant in November, 2018, after which the defendant's text messages to Rosario stopped. Durham also advised the court that, if the defense were to introduce evidence of Rosario's attempted recantation, it would open the door for the state to introduce evidence "that [Rosario] was placed in witness protection at her request following her grand jury testimony and that she was, with the state's assistance, moved out of state." The state would also intro-

duce evidence that Rosario recently had contacted authorities and asked to return to witness protection in light of the defendant's and Rodriguez' efforts to influence her testimony. Finally, Durham stated that Rosario was prepared to take the witness stand that day and to testify, consistent with her prior written statement and grand jury testimony, that she was with the defendant on the night of the murder and that she saw him shoot the victim.

When Durham finished speaking, the court observed that the state's proffered evidence, if adduced at trial, "might also warrant a consciousness of guilt instruction, which would alert the jurors to the fact that, if they found [that] the defendant [had been messaging Rosario] and did so because of this case and his concerns of being convicted, they could view the defendant's actions as being evidence that the defendant himself is conscious of his own guilt, and that could be used by the jury [against the defendant]." The court further stated that, in light of these developments, Dow had sought to make a deal with the state. The court then asked Dow to state for the record the nature of that deal. Dow responded that, "[w]hile there were grounds [on] which to cross-examine . . . Rosario, principally based on her recantation," the proffered evidence concerning the defendant's attempts, via an illegal cell phone, to influence Rosario's testimony was "a significant piece of [new] information" that he viewed as "very damaging" to the defendant and that, if introduced at trial, would be "fatal or near fatal to [the defendant's] case, whether or not there was a consciousness of guilt [instruction] or a tampering charge brought [against him] at a later point in time." Dow further stated that, during the recess, after extensive discussions with the defendant, he asked the state if it would be willing to forgo introducing evidence of the defendant's cell phone communications with Rosario if the defense were to limit its cross-examination of Rosario to a single question, namely, whether it was true that she was on PCP on the night of the murder.

When Dow finished speaking, the court confirmed that the parties had agreed that, on direct examination, the prosecutor would question Rosario about whom she was with and what she saw on the night of the murder but would not question her about her recent communications with the defendant, and Dow would limit his cross-examination to a single question regarding Rosario's PCP use, and "[t]hat will be it for . . . Rosario." The court then stated that it "thought it . . . important that, given these somewhat unique circumstances . . . the record be clear and not later examined without a clear reason for both sides' having chosen the course of action that they've chosen." When the trial resumed, consistent with the aforementioned agreement, the prosecutor questioned Rosario about who she was with and what she saw on the night of the murder,

but did not elicit testimony from Rosario regarding the defendant's recent communications with her, and Dow limited his cross-examination to whether Rosario was on PCP on the night in question.

During his closing argument, Dow argued that "[o]ne of the big issues" at trial was the fact that two of the state's witnesses, Rosario and Lugo, were on PCP on the night of the shooting, thus potentially undermining their observations of what occurred that night. Dow further stated: "[*N*]*ow, if you feel that, tactically, I made a wrong decision by not examining* [*Rosario*] *or cross-examining her, don't hold that against* [*the defendant*]. But her memory, talk about details, she can't remember what was said in the car even before or afterward, can't remember what happened in the car afterward, that is, where they went, can't remember, according to her, if there was a gun, can't remember anything, where there's a gun. And, significantly, listen to her testimony in comparison to Irizarry's. Irizarry [testified that] there's an argument. The shooter then goes back, pulls the gun out of the car, comes back, and does the shooting. Rosario, left the car, went over to the shooting." (Emphasis added.) The prosecutor responded in his rebuttal argument as follows: "Now, let's talk about . . . Rosario and PCP. Again, she was not asked about any level of intoxication at the time she witnessed the shooting of [the victim] by [the defendant]. She was in the car with the defendant the entire night. It wasn't like she showed up on Main Street and happen[ed] to see him. He was driving, except when he got out, went across the street, and she witnesses him shoot [the victim], and then return to the car with that semi-automatic weapon. *There's no question on who she was with, and what she saw. The defendant didn't even cross her on any of that.* He didn't talk about, again, with Lugo or her, levels of how [PCP] affects you individually or what you see, do you react poorly with it, none of that. He just wants you to discredit them because the word PCP was used." (Emphasis added.) At no point during or after the prosecutor's rebuttal argument did defense counsel object to any aspect of that argument.

On appeal, however, the defendant claims that two sentences of the prosecutor's rebuttal argument violated the parties' agreement regarding Rosario's testimony, namely, "[t]here's no question on who [Rosario] was with, and what she saw. The defendant didn't even cross her on any of that." Although the agreement itself related to the scope of the direct examination and cross-examination of Rosario and not to permissible inferences to be drawn from that evidence, and despite the fact that the trial court did not make a specific ruling or order prohibiting the state—or either party for that matter—from making an adverse comment during closing argument on defense counsel's failure to cross-examine Rosario, the defendant contends that the pros-

ecutor "knew or should have known that such a comment would violate the intrinsic character of the agreement." The defendant further contends that the prosecutor's rebuttal argument "unfairly suggested and implied that the reason [defense counsel] didn't . . . [cross-examine Rosario] on who she was with and what she saw was because [counsel] essentially accepted her testimony." (Emphasis omitted; internal quotation marks omitted.) We agree with the state that, even if we assume, for purposes of our analysis, that the prosecutor's argument violated the "intrinsic character" of the parties' agreement and, therefore, was improper, it did not deprive the defendant of a fair trial.

Although the defendant's claim is unpreserved, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . .

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citation omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560–61, 34 A.3d 370 (2012).

It is well established that prosecutorial impropriety can occur during final or rebuttal argument. See, e.g., *State* v. *Weatherspoon*, 332 Conn. 531, 551, 212 A.3d 208 (2019). "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence of] the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009).

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State*

v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 561.

Applying these principles to the present case,[6] we have no difficulty in concluding that the prosecutor's brief argument during his rebuttal argument referencing defense counsel's failure to cross-examine Rosario, even assuming it was improper because it violated the "intrinsic character" of the parties' agreement, did not deprive the defendant of a fair trial. First, the argument was clearly not perceived by Dow to have been so improper as to elicit an objection from him. See, e.g., *State* v. *Weatherspoon*, supra, 332 Conn. 558 (defense counsel's failure to object to allegedly improper comments is "a strong indication that they did not carry substantial weight in the course of the trial as a whole and were not so egregious that they caused the defendant harm"); *State* v. *Ceballos*, 266 Conn. 364, 414, 832 A.2d 14 (2003) (emphasizing that "[defense] counsel's failure to object at trial, [although] not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error" (emphasis omitted)). Second, although no curative measures were adopted, the absence of such measures is attributable to Dow's failure to object or request any curative instruction from the court. Thus, Dow "bears much of the responsibility for the fact that [the] claimed impropriet[y] went uncured." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 291, 973 A.2d 1207 (2009); see id. (emphasizing court's "continue[d] . . . adhere[nce] to the well established maxim that defense counsel's failure to object to the prosecutor's argument . . . when [it is] made suggests that defense counsel did not believe that [it was] unfair in light of the record of the case at the time" (internal quotation marks omitted)).

In terms of the extent to which the alleged impropriety was invited by defense counsel's conduct or argument, we agree with the state that Dow bears at least partial responsibility for inviting the prosecutor's allegedly improper argument. As previously indicated, the prosecutor made no mention of Dow's failure to cross-examine Rosario during his initial closing argument. It was only after Dow raised the issue by arguing that the jury should draw no adverse inference from his decision not to cross-examine Rosario more thoroughly that the prosecutor likewise commented on the issue during his

rebuttal argument. See, e.g., *State* v. *Jordan*, 314 Conn. 89, 114, 101 A.3d 179 (2014) (there was no due process violation when prosecutor's improper comment "was in direct response to a similar statement by defense counsel"); *State* v. *Northrop*, 213 Conn. 405, 421, 568 A.2d 439 (1990) (there was no impropriety or due process violation when state's closing argument "was in direct response to the defendant's prior argument"); *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986) (it is axiomatic that party who initiates discussion opens door to rebuttal by opposing party). In such circumstances, "the prejudicial impact [of the comment is] not as great as when [the] comment is totally unprovoked." *State* v. *Falcone*, 191 Conn. 12, 23–24, 463 A.2d 558 (1983).

With respect to the severity of the alleged impropriety, it is clear that the jury did not need the prosecutor to tell it about Dow's failure to cross-examine Rosario. Jurors likely would have noticed the unusually truncated nature of the cross-examination entirely on their own, irrespective of the prosecutor's argument, and drawn from it the logical inference that the defendant had little with which to challenge Rosario's testimony concerning who she was with and what she saw on the night of the murder, apart from assertions that her use of PCP had affected her perception and recollection of the details of that evening. In light of the foregoing, we conclude that the alleged impropriety was relatively minor.

We turn now to the final two *Williams* factors: the centrality of the impropriety to the critical issues in the case and the strength of the state's case. Although Rosario was an important state's witness whose credibility was undeniably important, the state's case was not dependent on her. Two other individuals, Lugo and Irizarry, also witnessed the murder, and their testimony was largely consistent with each other as well as with Rosario's testimony. Despite the passage of time, their testimony, like Rosario's, carried the added weight of coming from people who knew the defendant prior to the murder. See, e.g., *State* v. *Guilbert*, 306 Conn. 218, 259–60, 49 A.3d 705 (2012) ("identification of a person who is well known to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not well known to the eyewitness"); *State* v. *Outing*, 298 Conn. 34, 100 n.8, 3 A.3d 1 (2010) (*Palmer, J.*, concurring) (inherent dangers of eyewitness identifications "are generally limited to eyewitness identifications of strangers or persons with whom the eyewitness is not very familiar"), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). At the time of the murder, Lugo had known the defendant for several years and considered him a friend, and, although Irizarry may not have known the defendant as well, he knew him well enough to know his name and to greet him when they

passed on the street. He was also familiar enough with him to note that his presence at the crime scene on the night of the murder was out of the ordinary. In short, although the state's case may not have been overwhelming, it was not so weak as to think that there is a reasonable probability that the verdict would have been different in the absence of the alleged impropriety.[7] See *State* v. *Thompson*, 266 Conn. 440, 483, 832 A.2d 626 (2003) ("[this court has] never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial"). Accordingly, the defendant cannot prevail on his claim that prosecutorial impropriety deprived him of his right to a fair trial.

## II

The defendant next claims that the trial court committed both constitutional and evidentiary error in precluding defense counsel from impeaching Lugo and Irizarry with certain prior felony convictions and in requiring two of Irizarry's prior convictions to be referred to only as "unnamed" felonies punishable by more than one year of imprisonment. We disagree.

The following additional facts are relevant to our resolution of this claim. During jury selection, the state provided defense counsel with copies of Lugo's and Irizarry's criminal records. Lugo's record revealed that he had three prior felony convictions: a 2010 conviction of possession of marijuana, a 2006 conviction of failure to appear in the first degree, and a 2006 conviction of possession of narcotics. Irizarry's record included five prior felony convictions: a 2017 conviction of assault in the second degree, a 2017 conviction of violation of a protective order, a 2005 conviction of sale of a controlled substance, a 2005 conviction of larceny in the second degree, and a 2004 conviction of sale of a controlled substance.

On the day that Lugo and Irizarry were scheduled to testify, the court ruled on the admissibility of each of their prior convictions. The court aptly noted that, pursuant to § 6-7 (a) of the Connecticut Code of Evidence and this court's caselaw, three factors determine whether a prior conviction may be admitted to impeach a witness' credibility: (1) the extent of the prejudice likely to arise from the evidence, (2) whether the conviction is indicative of the witness' untruthfulness, and (3) the conviction's remoteness in time. See, e.g., *State* v. *Skakel*, 276 Conn. 633, 738, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Applying these factors, the court concluded that Lugo's 2006 convictions of possession of narcotics and failure to appear in the first degree were inadmissible because both were more than ten years old and neither was probative of Lugo's veracity. The court permitted Lugo's 2010 conviction of possession of marijuana to be used, but only as an unnamed felony, unless the state elicited

the name of the felony first, as the state ultimately did in this case.[8]

With respect to Irizarry, the court allowed the defense to use his 2017 convictions of assault in the second degree and violation of a protective order but required defense counsel to refer to them only as unnamed felonies. Despite its remoteness in time, the court permitted the use of Irizarry's 2005 larceny conviction because larceny is a crime that bears directly on a person's general disposition toward untruthfulness. The court excluded Irizarry's 2004 and 2005 convictions of sale of a controlled substance, however, due to their remoteness in time and because neither bore on Irizarry's veracity.

The following standard of review and legal principles guide our analysis of the defendant's claim. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 252, 856 A.2d 917 (2004).

"Generally, evidence that a witness has been convicted of a crime is admissible to impeach his credibility if the crime was punishable by imprisonment for more than one year. General Statutes § 52-145 (b); Conn. Code Evid. § 6-7 (a). . . . [I]n evaluating the separate [factors] to be weighed in the balancing process, there is no way to quantify them in mathematical terms. . . . Therefore, [t]he trial court has wide discretion in this balancing determination and every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done. . . . With respect to the remoteness prong of the balancing test, we have endorsed a general guideline of ten years from conviction or release from confinement for that conviction, whichever is later, as an appropriate limitation on the use of a witness' prior conviction. . . . [T]he ten year benchmark . . . [however] is not an absolute bar to the use of a conviction that is more than ten years old, but, rather, serves merely as a guide to assist the trial judge in evaluating the conviction's remoteness. . . . We have recognized, moreover, that convictions having some special significance [on] the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 738–39.

"Not all felony crimes bear equally on a defendant's veracity. [This court] has recognized that crimes involv-

ing larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements. . . . [I]n common human experience acts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct [reflecting] on a man's honesty . . . ." (Internal quotation marks omitted.) *State* v. *Tarasiuk*, 192 Conn. App. 207, 217, 217 A.3d 11 (2019). "Although drug addiction or drug use may be probative of a witness' credibility for other reasons, such as a witness' ability to accurately perceive and to remember events, this court has rejected the proposition that drug addiction is probative of veracity." *State* v. *Rivera*, 335 Conn. 720, 732, 240 A.3d 1039 (2020).

Applying these principles to the present case, we cannot conclude that the trial court abused its discretion in precluding defense counsel from (1) impeaching Lugo with his 2006 convictions of possession of narcotics and failure to appear in the first degree, and (2) impeaching Irizarry with his 2004 and 2005 convictions of sale of a controlled substance. As the trial court properly noted, each of these convictions was at least thirteen years old at the time of trial, and none was directly probative of the witnesses' veracity. See, e.g., *State* v. *Clark*, 314 Conn. 511, 515, 103 A.3d 507 (2014) ("it is rare for a felony conviction that is more than ten years old [to retain] the minimal probative value sufficient to overcome its prejudice" (internal quotation marks omitted)). Acknowledging that the convictions were remote in time and not probative of the witnesses' truthfulness, the defendant nevertheless contends that they should have been admitted because "[all] crimes involving sentences of more than one year affect the credibility of a witness." (Internal quotation marks omitted.) He further contends that Lugo's conviction for failure to appear should have been admitted because it involved "willful disobedience of a court order" and, therefore, demonstrated "a lack of respect for the authority of the judicial process."

Although we recognize the possibility that any criminal conviction may reflect poorly on a person's character and suggest a lack of respect for the rule of law, we have long held that "only a conviction [of] perjury or some kind of fraud bears directly [on] untruthfulness." *State* v. *Nardini*, 187 Conn. 513, 523, 447 A.2d 396 (1982); see also *State* v. *Geyer*, 194 Conn. 1, 13, 480 A.2d 489 (1984) ("[a]lthough [narcotics] convictions reflect adversely on [a witness'] general character, they have no special or direct materiality to [a witness'] credibility"). We have also held that, for purposes of assessing a witness' credibility, the probative value of *any* conviction, even one involving dishonesty, is "greatly diminished by the extended period of time [that] ha[s] elapsed since [its] occurrence." *State* v. *Nardini*, supra, 187 Conn. 528. Thus, we repeatedly have held that, "unless a conviction ha[s] some special significance to untruthfulness, the fact that it [is] more than ten years old [will]

most likely preclude its admission under our balancing test." (Emphasis omitted.) *Label Systems Corp.* v. *Agha-mohammadi*, 270 Conn. 291, 309, 852 A.2d 703 (2004); see also id., 313–14 ("the fact that a prior conviction is more than ten years old should greatly increase the weight carried by the third prong in the balancing test set forth in § 6-7 of the Connecticut Code of Evidence, unless that prior conviction relates to the witness' veracity"). We can perceive no reason, and the defendant has proffered none, to deviate from these well established principles.

We also disagree with the defendant that the trial court abused its discretion by requiring defense counsel to refer to Irizarry's 2017 convictions for assault in the second degree and violation of a protective order as unnamed felonies, rather than by their proper names. We previously have stated that, "[t]o avoid unwarranted prejudice to the witness, when a party seeks to introduce evidence of a felony that does not directly bear on veracity, a trial court ordinarily should permit reference only to an unspecified crime carrying a penalty of greater than one year that occurred at a certain time and place." *State* v. *Pinnock*, 220 Conn. 765, 780, 601 A.2d 521 (1992). "Th[is] prudent course [of permitting evidence of unnamed felony convictions] allows the jury to draw an inference of dishonesty from the prior conviction without the extraordinary prejudice that may arise from naming the specific offense. . . . Ultimately, [t]he trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions." (Citations omitted; internal quotation marks omitted.) *State* v. *Muhammad*, 91 Conn. App. 392, 401, 881 A.2d 468, cert. denied, 276 Conn. 922, 888 A.2d 90 (2005).

Acknowledging that "the ultimate decision whether to allow the 'name' of a conviction is a discretionary one," the defendant argues nonetheless that the trial court should have allowed the names of Irizarry's 2017 convictions to be used because Irizarry was on probation for the assault conviction at the time of trial and because the violation of a protective order "reflects disrespect for the authority of a judicial officer." We disagree. "Whe[n] the name of a prior conviction is not probative of truthfulness, and may entice the trier of fact to view the witness negatively because of the prior bad act, the trial court has [wide] discretion to conclude that it should not be admitted." *State* v. *Pinnock*, supra, 220 Conn. 781; see also *State* v. *Geyer*, supra, 194 Conn. 13 ("[C]onviction of a crime not directly reflecting on credibility clearly lacks the direct probative value of a criminal conviction indicating dishonesty or a tendency to make [a] false statement. Thus, the balance used to measure admissibility of prior convictions is *weighted less heavily toward admitting the prior conviction*

*when it involves a crime related only indirectly to credibility*." (Emphasis added.)). So long as our trial courts adhere to the principles discussed herein governing the admission of prior conviction evidence, their decisions with respect to such matters will not be disturbed.

## III

The defendant's final claim is that the trial court erred in relation to two portions of its charge to the jury. Specifically, the defendant claims that the court improperly declined to charge the jury that the defendant was not obliged to present any evidence and that the jury should draw no adverse inference from his decision not to present any. The defendant further claims that the court improperly declined to insert the word "conclusively" into its instruction on uncharged misconduct. Specifically, the defendant claims that the court committed reversible error by declining to instruct the jury, in accordance with the model criminal jury instructions on the Judicial Branch website, that it could consider evidence of his involvement in the sale of drugs only to the extent that the jury believed that the defendant was, in fact, involved in the sale of drugs and, then, only to the extent that the jury found that it " 'logically, rationally *and conclusively*' " supported the issue for which it was being offered—namely, to establish the defendant's motive for killing the victim. (Emphasis added.) We disagree with these claims.

The following additional facts are relevant to our analysis of these claims. On the third day of trial, the trial court e-mailed a copy of its proposed jury charge to the parties in preparation for the charge conference scheduled for later that week. The court indicated that the parties could e-mail any requests for changes to the court and that the court would discuss them with the parties at the upcoming charge conference. Prior to the charge conference, the defendant filed his requests to charge, seeking several modifications to the court's proposed instructions. Specifically, although the court's proposed instructions included an instruction on the "[d]efendant's [o]ption to [t]estify" and provided that the defendant "had no obligation to testify," that he "has a constitutional right not to testify," and that the jury "must draw no unfavorable inferences from the defendant's choice not to testify," defense counsel requested that the court add a complementary instruction stating: "Similarly, [the defendant] is not obliged to present any evidence, and you may not draw any unfavorable inference from that, either." The court ultimately declined to add that instruction, stating that it would adhere to its proposed instruction, which mirrored the model criminal jury instruction on the Judicial Branch website concerning the defendant's option to testify.[9]

The defendant also requested a change to the court's

proposed instruction on uncharged misconduct evidence. At trial, the state presented uncharged misconduct evidence through Irizarry's testimony that the defendant had sold heroin and was doing so on the night of the murder. In his closing argument, the prosecutor argued that the defendant had killed the victim because of a dispute over the sale of drugs. At the conclusion of Irizarry's testimony, the court gave the jury a limiting instruction and indicated that it would explain the purpose for which the evidence could be used during its final charge to the jury. Subsequently, the court provided the parties with a copy of its proposed jury instructions. The instruction on uncharged misconduct was titled "Evidence Admitted for a Limited Purpose" and provided in relevant part: "You may recall that you heard testimony from . . . Irizarry regarding his understanding that the defendant had been engaged in the selling of illegal drugs in Hartford at and around the date of the charged offense. As I indicated to you shortly after this testimony was received, the defendant's involvement in such activity is relevant and may be considered by you in your deliberations only to the extent that you believe such testimony to be true and, then, only to the extent that it helps to put the events of June 11, 2003, into context and to provide evidence as to a motive for the defendant to have committed the crime with which he is here charged. Beyond that stated purpose, however, the fact that the defendant may have been engaged in such drug activities may not be considered by you as evidence that the defendant, simply by virtue of that activity, is a bad person or one who is, by nature, more likely to commit a crime." In his request to charge, the defendant requested that the court replace the word "understanding" with the word "belief" and add language to the effect that the misconduct evidence could be considered by the jury only if the jury believed it and, then, only if the jury found that it "logically, rationally and conclusively" supported the purpose for which it was offered.

At the charge conference, the court granted the defendant's request to replace the word "understanding" with the word "belief" and heard arguments from the parties regarding the defendant's request to add that the jury could consider the prior misconduct evidence only if it found that the evidence "logically, rationally and conclusively" supported the purpose for which it was offered. Defense counsel argued that, in its present form, the court's proposed instruction "left out some of the meat of the standard" and lacked "the amount of oomph that's necessary on this particular subject matter." He further noted that the requested language was copied "verbatim" from or was "essentially equivalent" to instruction 2.6-5 of the model criminal jury instructions on the Judicial Branch website.[10] The prosecutor responded that the defendant's requested charge went "too far." The next morning, the court inquired whether the par-

ties had received its updated jury instructions incorporating "some of the changes that were discussed [during the charge conference] and reflect[ed] the court's rulings in the areas where there was not full agreement." Defense counsel stated that, although the court had added that the jury could consider the uncharged misconduct only to the extent that it found that the evidence "logically and rationally" supported the state's theory as to motive, it had failed to include the word "conclusively," which defense counsel "felt strongly about . . . ." The court indicated that it was still considering whether to include the word. Ultimately, however, the court did not include it.[11]

Our standard of review for claims of instructional error is well settled. "To determine whether an error in the charge to the jury exists, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict. . . . In appeals not involving a constitutional question [we] must determine whether it is reasonably probable that the jury [was] misled . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Woods*, 234 Conn. 301, 307–308, 662 A.2d 732 (1995). "[I]n appeals involving a constitutional question, [however, the standard is] whether it is reasonably *possible* that the jury [was] misled." (Emphasis added; internal question marks omitted.) Id., 308. "[Although] a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 317, 977 A.2d 209 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014). Finally, "[a] challenge to the validity of jury instructions presents a question of law over which [we exercise] plenary review." (Internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 849–50, 256 A.3d 131 (2021). With these principles in mind, we turn to the defendant's claims.

A

We begin with the defendant's claim that the trial court improperly declined to instruct the jury that the defendant "is not obliged to present any evidence, and [the jury] may not draw any unfavorable inference from that . . . ." Because "[t]he presumption of innocence . . . is a basic component of a fair trial under our system of criminal justice"; (internal quotation marks omitted) *State* v. *Brawley*, 321 Conn. 583, 587, 137 A.3d 757

(2016); we must determine whether it is reasonably possible that the jury was misled by the trial court's failure to give the requested instruction. See *State* v. *Walton*, 227 Conn. 32, 64–65, 630 A.2d 990 (1993) ("[w]e have recognized . . . that . . . claimed instructional errors regarding the burden of proof or the presumption of innocence . . . are constitutional in nature" (citations omitted)).

Our review of the jury charge as a whole compels the conclusion that it is not reasonably possible that the jury was misled by the trial court's omission of the requested instruction because the substance of that instruction was clearly contained in the court's other instructions. See, e.g., *State* v. *Cutler*, supra, 293 Conn. 317 ("[A] [trial] court need not tailor its charge to the precise letter of . . . a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." (Internal quotation marks omitted.)); see also *State* v. *Denby*, 235 Conn. 477, 485, 668 A.2d 682 (1995) ("[t]he test of a court's charge is not whether it is as accurate [on] legal principles as the opinions of a court of last resort but [rather] whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law" (internal quotation marks omitted)).

Specifically, as the state contends, the requested instruction, which sought to include language instructing the jury that the defendant was not obliged to present any evidence and that it must draw no adverse inference from his decision not to do so, was subsumed within the trial court's instructions that (1) the defendant is presumed to be innocent unless and until proven guilty beyond a reasonable doubt, and this presumption continues with him unless and until such time as all the evidence produced at trial satisfies the jury beyond a reasonable doubt that the defendant is guilty, (2) this presumption of innocence may be overcome only if the state introduces evidence that establishes the defendant's guilt beyond a reasonable doubt, (3) the burden to prove the defendant guilty of the crime with which he is charged is on the state, and "[*t*]*he defendant does not have to prove his innocence*," and (4) the defendant was under no obligation to testify, has a constitutional right not to testify, and the jury must draw no unfavorable inferences from the defendant's choice not to testify. (Emphasis added.) These instructions, taken together, clearly informed the jury that the defendant was under no obligation to present evidence or to otherwise prove his innocence. Indeed, the court's instruction that "[t]he defendant does not have to prove his innocence" necessarily conveyed that the defendant did not have to *produce evidence to prove his innocence*. In addition, the record reflects that, during its preliminary jury instructions at the start of trial, the trial court did,

in fact, instruct the jury that the defendant was not obliged to present evidence. Specifically, the court stated in relevant part: "Following the presentation of the state's evidence, the defendant may, if he wishes, present evidence on his own behalf. But remember, as I told you, the defendant is under no obligation to do so. The law does not require a defendant to prove his innocence or to present any evidence." Furthermore, the court emphasized the defendant's presumption of innocence, stating in relevant part: "[E]very defendant in a criminal case is presumed to be innocent, and this presumption remains with the defendant throughout the trial unless and until the defendant is proven guilty beyond a reasonable doubt. . . . The law does not require the defendant to prove his innocence."

We recognize that the defendant's requested instruction was an accurate statement of the law and relevant to the issues at hand. As this court repeatedly has stated, however, "[although] a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request." (Internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); see also *State* v. *Berger*, 249 Conn. 218, 236, 733 A.2d 156 (1999) ("trial court was not obligated to provide the requested instruction to the jury because the substance of the requested instruction was implicit in the court's charge and did not require further explication"). Accordingly, because we conclude that the defendant's requested instruction was subsumed within and implicit in the court's preliminary and final instructions on the defendant's option to testify, the presumption of innocence, and the state's burden of proof, the defendant cannot prevail on his first claim of instructional error.

B

We next consider the defendant's claim that the trial court erred in omitting the word "conclusively" in its instruction on uncharged misconduct. Specifically, the defendant argues that the trial court improperly declined to instruct the jury, in accordance with instruction 2.6-5 of the model criminal jury instructions on the Judicial Branch website; see footnote 10 of this opinion; that it could consider evidence of the defendant's uncharged misconduct only if the jury believed it and, then, only if it found that "it logically, rationally *and conclusively* supports the issue[s] for which it is being offered by the state . . . ." (Emphasis added.) We conclude that instruction 2.6-5, titled "Other Misconduct of Defendant," is an incorrect statement of the law insofar as it requires the jury to find that uncharged misconduct "conclusively" supports the issue for which it is offered. Accordingly, the defendant cannot prevail on his second claim of instructional error.

As we previously explained, the defendant asked the court to instruct the jury that it could consider the uncharged misconduct evidence only if the jury believed it and, then, only if it found the evidence "logically, rationally *and conclusively*" supported the purpose for which it was offered. (Emphasis added.) In its charge to the jury, however, the court omitted the word "conclusively," instructing the jury in relevant part that, "if you do not credit . . . Irizarry's claim regarding the defendant's drug selling activity or, even if you do, if you find that it does not logically and rationally support the state's theory of motive, then you may not consider that testimony to bear on motive nor for any other purpose." On appeal, the defendant claims that the trial court committed reversible error by omitting the requested word.[12] We disagree.

We begin our analysis by noting that "[t]he language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court. . . . [W]e previously have cautioned that the . . . jury instructions found on the Judicial Branch website are intended as a guide only, and that their publication is no guarantee of their adequacy. See, e.g., *State* v. *Reyes*, 325 Conn. 815, 821–22 n.3, 160 A.3d 323 (2017) (The Judicial Branch website expressly cautions that the jury instructions contained therein [are] intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch is not a guarantee of their legal sufficiency. . . .)." (Citation omitted; internal quotation marks omitted.) *State* v. *Gomes*, supra, 337 Conn. 853 n.19; see also *Snell* v. *Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 775, 212 A.3d 646 (2019) (*Ecker, J.*, concurring) ("The [model jury] instructions are promulgated by a distinguished panel of . . . members [of the Criminal Jury Instruction Committee] who have undertaken the Sisyphean task of synthesizing and articulating the law governing a broad variety of . . . cases in a form readily understandable to a lay jury. They provide commendable guidance. But precisely because the task is so difficult— the law is not always certain, nor is it static, nor is it always produced or pronounced in 'one size fits all' formulations—it is fair to suggest that trial lawyers are well advised to 'trust but verify' these model instructions to ensure that they are correct, current, and properly crafted to fit the particular case at hand.").

This court previously has considered and rejected claims that a heightened standard of proof should apply to the admission and use of prior misconduct evidence. In *State* v. *Aaron L.*, 272 Conn. 798, 865 A.2d 1135 (2005), for example, we were required to determine "whether the trial court, before admitting prior misconduct evidence, must find by a heightened standard of proof that

the prior misconduct in fact occurred . . . ." Id., 821. In considering this issue, we "examined the ways in which our Code of Evidence already protects parties against any unfair prejudice that might arise from the admission of prior misconduct evidence. In particular, we identified the sections of the Code of Evidence that provide this protection, including, but not limited to, § 4-5 (b), which requires that prior misconduct evidence be offered for a proper purpose, § 4-1, which requires that prior misconduct evidence be relevant to an element in issue, and § 4-3, which requires the trial court to determine whether the probative value of the evidence is outweighed by its potential for unfair prejudice. . . . We also found significant the limiting instructions the trial court is required to give the jury under § 1-4 [of the Connecticut Code of Evidence] that the evidence is to be considered only for the proper purpose for which it was admitted. . . . We concluded that following application of these requirements, whatever inferences should be drawn from the defendant's prior [mis]conduct are for the jury to determine. . . . Accordingly, we decline[d] to adopt a rule requiring that the trial court make a preliminary finding by clear and convincing evidence that prior misconduct occurred before submitting that evidence to the jury. . . .

"Thus, our conclusion . . . implicitly reject[ed] the notion that any particular standard of proof is necessary in a trial court's jury instructions regarding prior misconduct evidence, and [made] clear that prior misconduct evidence may be considered by the jury for a proper purpose if there [is] evidence from which the jury reasonably could . . . [conclude] that the prior act of misconduct occurred and that the defendant was the actor." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Cutler*, supra, 293 Conn. 320–21.

In *Cutler*, we relied on our reasoning in *Aaron L.* in concluding that the trial court was not required to instruct the jury that it must "find the existence of a prior act of misconduct by a preponderance of the evidence before considering it for a proper purpose." Id., 315. Although we recognized that the issue in *Aaron L.* was one of the admissibility of prior misconduct evidence, whereas, in *Cutler*, the issue before us was the propriety of jury instructions on the use of prior misconduct evidence, we concluded that such a distinction did not prevent us "from employing our well reasoned conclusion in *Aaron L.* as guidance in the present case." Id., 320. In so doing, we concluded that, "[when] the admission of prior misconduct evidence depends on the trial court's determination that there is sufficient evidence from which the jury reasonably could conclude that the prior acts of misconduct occurred and that the defendant was the actor . . . we see no reason to impose on trial courts a jury instruction that requires jurors to consider the properly admissible prior miscon-

duct evidence at a higher standard. . . . Accordingly, we conclude[d] that it is not necessary that a trial court instruct the jury that it must find, by a preponderance of the evidence, that prior acts of misconduct actually occurred at the hands of the defendant. Instead, a jury may consider prior misconduct evidence for the proper purpose for which it is admitted if there is evidence from which the jury reasonably could conclude that the defendant actually committed the misconduct." (Citations omitted; footnote omitted.) Id., 321–22. We concluded, therefore, that the trial court properly instructed the jury that "it could consider the state's prior misconduct evidence if it 'believe[d]' that evidence and found that it 'logically and rationally' supported the issue for which it was being offered."[13] Id., 322.

Guided by this prior case law, it is apparent that the trial court properly declined to instruct the jury that it could consider the prior misconduct evidence only if it found that it "conclusively" supported the state's theory as to motive. It is axiomatic that motive is not an element of the crime of murder; see, e.g., *State* v. *Pinnock*, supra, 220 Conn. 792; and, therefore, the state was not required to prove it by a standard different from the reasonable and logical standard applicable to all other facts. "[Although] the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . *If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 617, 682 A.2d 972 (1996).

In light of the foregoing, we conclude that the trial court properly declined the defendant's request to include the word "conclusively" in its instruction on the use of prior misconduct evidence. Rather, the court properly instructed the jury that, even if it credited Irizarry's testimony that the defendant was engaged in the sale of drugs on the night in question, the jury could consider that evidence only if it found that it "logically and rationally support[ed] the state's theory of motive . . . ."[14]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[3] We note that neither Lugo, Irizarry, nor Rosario came forward with information about the shooting until they were contacted by investigators from the cold case unit of the Office of the Chief State's Attorney, in late 2015 and early 2016. As discussed subsequently in this opinion, all three witnesses separately identified the defendant as the shooter in a double-blind, sequential photographic array procedure and gave statements implicating the defendant in the victim's murder.

[4] Irizarry testified that, although he could not see whether the defendant was holding a gun from where he was standing, he heard a gunshot approximately one second after the defendant extended his arm toward the victim.

[5] General Statutes § 54-47c (a) provides: "Any judge of the Superior Court, Appellate Court or Supreme Court, the Chief State's Attorney or a state's attorney may make application to a panel of judges for an investigation into the commission of a crime or crimes whenever such applicant has reasonable belief that the administration of justice requires an investigation to determine whether or not there is probable cause to believe that a crime or crimes have been committed."

[6] In its appellate brief, the state urges us, due to the "unique circumstances of the present case," to forgo deciding whether the prosecutor engaged in impropriety during his rebuttal argument and, instead, to assume, arguendo, that the prosecutor's argument was improper and to proceed directly to a due process analysis under the *Williams* factors. The state argues that such analysis compels the conclusion that "any brief, isolated impropriety could not have deprived the defendant of his due process right to a fair trial."

[7] Because we do not view the prosecutor's alleged impropriety as overtly offensive or egregious, we decline the defendant's request that we invoke our supervisory authority over the administration of justice to grant him a new trial. We previously have explained that "[w]e may invoke our inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . *We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively present such assaults on the integrity of the tribunal.* . . . Accordingly, in cases in which prosecutorial [impropriety] does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial [impropriety] in the future." (Emphasis added; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 405–406, 897 A.2d 569 (2006).

[8] During his direct examination of Lugo, the prosecutor elicited from him the fact that the 2010 conviction was for possession of marijuana.

[9] The court's final instruction on the defendant's option to testify was as follows: "The defendant has not testified in this case. An accused person has the option to testify or not testify at the trial. The defendant here thus had no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's choice not to testify."

[10] Instruction 2.6-5 provides in relevant part: "The state has offered evidence of other acts of misconduct of the defendant. This is not being admitted to prove the bad character, propensity, or criminal tendencies of the defendant. Such evidence is being admitted solely to show or establish . . . a motive for the commission of the crimes alleged. . . . You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. *You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issue[s] for which it is being offered by the state*, but only as it may bear on the issue[s] of [motive]. On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issue[s] for which it is being offered by the state, namely [to establish a motive for the commission of the crimes alleged], then you may not consider that testimony for any purpose. . . ." (Emphasis added; footnotes omitted.) Connecticut Criminal Jury Instructions 2.6-5, available at https://www.jud.ct-.gov/JI/Criminal/Criminal.pdf (last visited June 7, 2022).

[11] The court's final instruction on uncharged misconduct was as follows: "[Y]ou heard testimony from . . . Irizarry regarding his *belief* that the defendant had been engaged in the selling of illegal drugs in Hartford at and

around the date of the charged offense. As I indicated to you shortly after this testimony was received, the defendant's involvement in such activity is relevant and may be considered by you in your deliberations only to the extent that you believe that the defendant was, in fact, involved in drug selling and, if so, only to the extent that such activities of the defendant *logically and rationally* provide evidence as to a motive for him to have committed the crime with which he is charged.

"On the other hand, if you do not credit . . . Irizarry's claim regarding the defendant's drug selling activity, or, even if you do, if you find that it does not *logically and rationally* support the state's theory of motive, then you may not consider that testimony to bear on motive nor for any other purpose. Beyond the issue of motive, however, the fact that the defendant may have been engaged in such drug activities may not be considered by you as evidence that the defendant simply by virtue of that activity is a bad person or one who is by nature more likely to commit a crime." (Emphasis added.)

[12] Citing only three cases, the defendant argues that "Connecticut criminal juries are routinely if not invariably instructed that they can consider evidence of uncharged misconduct if they 'believe it' and if they 'find that it logically, rationally and conclusively' supports the issue or issues for which it was offered by the state." We note, however, that our research uncovered many cases in which our juries were not instructed in this regard but, rather, were charged using the "logically and rationally" standard that the trial court utilized in the present case. See, e.g., *State* v. *Collins*, 299 Conn. 567, 581 n.15, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011); *State* v. *Cutler*, supra, 293 Conn. 316; *State* v. *Beavers*, 290 Conn. 386, 407 n.21, 963 A.2d 956 (2009); *State* v. *Lopez*, 199 Conn. App. 56, 63 n.15, 234 A.3d 990, cert. denied, 335 Conn. 951, 238 A.3d 21 (2020); *State* v. *Morales*, 164 Conn. App. 143, 175, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016); *State* v. *Urbanowski*, 163 Conn. App. 377, 398 n.10, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017); *State* v. *Dougherty*, 123 Conn. App. 872, 884, 3 A.3d 208, cert. denied, 299 Conn. 901, 10 A.3d 521 (2010); *State* v. *Henry*, 41 Conn. App. 169, 180 n.5, 674 A.2d 862 (1996).

[13] The defendant argues that *Aaron L.* and *Cutler* are inapplicable to the present case because those cases "involved the issue of whether a particular standard of proof is needed in order to establish that an act of misconduct has occurred," whereas, here, the issue involves the omission of the word "conclusively" in a jury charge, which "does not relate to the burden of proof for an act of misconduct [and] . . . serves an entirely different function." (Emphasis omitted; internal quotation marks omitted.) Specifically, the defendant argues that "[t]he state fails to recognize that the phrase 'logically, rationally and conclusively' . . . does not relate to whether an act of misconduct occurred; the phrase relates to whether the act of misconduct (if proved to the jury's satisfaction under the 'believe' standard) supports the proposition or issue for which the misconduct was offered . . . ." (Citation omitted; emphasis omitted.) We are not persuaded. Although we acknowledge that *Aaron L.* differs slightly insofar as it involved the question of whether the *trial court* was required to find, by clear and convincing evidence, that the alleged prior misconduct had occurred, *Cutler* is wholly applicable to the present case as it, too, involved the question of whether a trial court was required to instruct a jury that it must find prior misconduct evidence to be proven by a heightened standard. Notably, and as we explained, this court expressly rejected that proposition and concluded that it saw "*no reason to impose on trial courts a jury instruction that requires jurors to consider the properly admissible prior misconduct evidence at a higher standard.*" (Emphasis added.) *State* v. *Cutler*, supra, 293 Conn. 321–22.

[14] We note that our decision today is in no way intended to diminish the importance of a trial court's duty to safeguard against undue prejudice in cases involving uncharged misconduct evidence. Indeed, we emphasize that our trial courts are required to take great caution in admitting this evidence and in ensuring that our juries use it only for its proper purpose. In that regard, we previously have explained that such evidence is admissible only if (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions enumerated under § 4-5 of the Connecticut Code of Evidence, and (2) its probative value outweighs its prejudicial effect; see *State* v. *DeJesus*, 288 Conn. 418, 440, 953 A.2d 45 (2008); and we also have required that the admission of such evidence be accompanied by an appropriate cautionary instruction to the jury to minimize the risk of undue

prejudice to the defendant. See, e.g., *State* v. *Snelgrove*, 288 Conn. 742, 759, 954 A.2d 165 (2008); see also Conn. Code Evid. § 4-5 (b), commentary. We have done so because of the inherent risk of prejudice involved in the admission of this type of evidence. See, e.g., *State* v. *Braman*, 191 Conn. 670, 675, 469 A.2d 760 (1983) ("As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Citations omitted; internal quotation marks omitted.)); see also *State* v. *Santiago*, 224 Conn. 325, 347, 618 A.2d 32 (1992) (*Berdon, J.*, concurring and dissenting) ("When the sole purpose of the other crimes evidence is to show some propensity to commit the crime at trial, there is no room for ad hoc balancing. The evidence is then unequivocally inadmissible—this is the meaning of the rule against other crimes evidence. . . . It is fundamental to American jurisprudence that a defendant must be tried for what he did, not for who he is." (Citations omitted; internal quotation marks omitted.)). Thus, although we conclude that our trial courts are not required to instruct that a jury find that prior misconduct evidence "conclusively" supports the issue for which it was offered, we emphasize and highlight that such evidence is nonetheless unique and should continue to be handled with great caution.